**Duane W. DEDELOW, Jr., as Mayor of the City of Hammond and Hammond Development Corporation, Appellants–Defendants,**

v.

**Kathleen PUCALIK, as President of the Common Council of the City of Hammond, Appellee–Plaintiff.**

No. 45A03–0304–CV–148.

Court of Appeals of Indiana.

Dec. 24, 2003.

Thomas G. Stayton, Dana M. Lundberg, Baker & Daniels, Indianapolis, IN, Attorneys for Appellant Duane W. Dedelow, Jr.

Randall J. Nye, Beckman, Kelly & Smith, Hammond, IN, Attorney for Appellant Hammond Development Corporation.

Robert G. Berger, Highland, IN, David Paul Allen, Hammond, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

Duane W. Dedelow, as the Mayor of the City of Hammond ("the Mayor"), and the Hammond Development Corporation ("HDC") appeal from the trial court's declaratory judgment in favor of Kathleen Pucalik, as President of the Common Council of the City of Hammond ("the Council"). The appellants present one issue for our review: whether the trial court erred in concluding that a contract entered into by the City of Hammond, the Hammond Redevelopment Commission ("HRC"), the Hammond Port Authority ("HPA"), the Hammond Redevelopment Authority ("HRA"), and Horseshoe Hammond, Inc., successor in interest to Empress Casino Hammond Corporation ("the Casino"),[1] involved the transfer, encumbrance, or disposal of property rights belonging to the City of Hammond.

1. The Casino was a defendant below but has not filed an appearance in this appeal.

We reverse and remand.

The parties stipulated to the relevant facts at the trial court level. These facts reveal that in May of 1994, the Council adopted and the Mayor signed Ordinance No. 7685, which established a "riverboat development" within the City and provided for the spending of revenue earned from riverboat gambling for various purposes in certain percentages. Appendix at 272. This ordinance provided, "That a development agreement between the Hammond riverboat licensee and the City of Hammond shall be approved and authorized by ordinance by the Hammond City Council, within thirty (30) days of the State Gaming issuance of such license." *Id.* at 273. In 1996, the Mayor negotiated an agreement titled "Hammond Riverboat Gaming Project Development Agreement" ("the Agreement") with the Casino. The Council's attorney was present at several of the negotiation sessions and proposed changes to the Agreement, some of which were incorporated into the Agreement.

On June 17, 1996, the Council passed Ordinance No. 7887, which provided that the Agreement should be presented to and approved by the Council prior to its execution by the Mayor. The Council also simultaneously passed Ordinance No. 7888, which approved the Agreement. The Mayor vetoed both of these ordinances on June 27, 1996.[2] The Council sustained the vetoes on July 8, 1996. The Mayor executed the Agreement on June 21, 1996. Sub-sequently, the Mayor negotiated and executed four amendments to the Agreement without approval of the Council. At issue in the present case is the fourth amendment to the Agreement ("the Amendment").

The parties to the Amendment are the City of Hammond, the HRC, the HPA, the HRA, and the Casino. In the Amendment, the HRC grants the Casino an exclusive and irrevocable option to lease a portion of a piece of land known as the Marina Parcel. The Marina Parcel is owned by the HRA and was leased to the HRC on April 15, 1999. Also on April 15, 1999, the HRC and the HPA entered into an operating agreement whereby the HPA operates the Marina Parcel. The Amendment also stated that the HRC and the HPA would amend the intergovernmental lease which they had previously entered into to incorporate the terms of a proposed parking plan contained in the Amendment. In consideration for the granting of the option to lease the Marina Parcel, the Casino agreed to pay a total of $14,000,000. Of this sum, $8,700,000 was to be paid to the HDC,[3] $4,500,000 was to be paid to the HRC, and $800,000 was to be paid to the HPA.

On July 8, 2002, the Council filed a "Verified Complaint for Preliminary Injunction and Declaratory Judgment and Petition for Determination of the Nature of City Executive and Legislative Power" in the Lake Superior Court.[4] The Coun-

---

2. In a letter to the Council, the Mayor stated that he vetoed the ordinances because he believed they interfered with his executive authority as Mayor.

3. We note that although the HDC was not a party to the Amendment, it receives significant funds according to the terms thereof.

4. "If uncertainty exists or a dispute arises concerning the executive or legislative nature of a power or duty exercised or proposed to be exercised by a branch, officer, department, or agency of the government of a municipality, a petition may be filed in the circuit court of the county in which the municipality is located by the municipal executive, another municipal elected official, the president of the municipal legislative body, or any person who alleges and establishes to the satisfaction of the court that he is or would be adversely affected by the exercise of the power; how-

cil's complaint alleged that the Council and the Mayor had several meetings to resolve their differences, but that the Mayor was "adamant in insisting that his statutory authority to sign agreements gives him the power to make amendments to the riverboat agreement which require the riverboat licensee to pay millions of dollars to various groups without any approval or appropriation of funds by the Common Council." App. at 60. The complaint further alleged that the Mayor had made an agreement with the Casino without any involvement of the Council and had "direct[ed] the expenditure of funds paid by the [Casino] without any appropriation of funds by the Common Council," which the Council alleged violated Indiana law. *Id.* at 62. The complaint requested that the trial court "hold that the Mayor does not have exclusive authority to negotiate and execute contracts with the [Casino] which provide for the spending of millions of dollars which otherwise may have been available to the City for appropriation by the Common Council without any participation by the Common Council...." *Id.* at 63. The complaint also stated:

"Unless this Court enters a preliminary injunction, the Mayor may continue to make contracts with the [Casino] diverting millions of dollars which are desperately needed for public projects such as improving the infrastructure of the City and providing for adequate police and fire protection for private purposes such as the millions of dollars he has diverted to a private corporation to fix up old buildings in downtown Hammond. Such continued usurpation of power would cause irreparable damage to the citizens of the City of Hammond and would frustrate the exercise by the Common Council of its lawful fiscal authority to over-

see the finances of the City of Hammond and to appropriate all funds." *Id.* at 63–64.

The Mayor answered this complaint on October 18, 2002. The answer raised five defenses: (1) waiver and estoppel; (2) failure to state a claim upon which relief may be granted; (3) the doctrine of unclean hands; (4) laches; and (5) that the Council's action of sustaining the Mayor's vetoes acknowledged the Mayor's authority to enter into the Agreement.

On October 9, 2002, the trial court entered a "Stipulation and Order" which arose from a status conference held on September 20, 2002. This Order stated in part:

"The issue to be decided by the *en banc* panel of this Court in this lawsuit is the Council's claim that the Mayor has no authority to reach an agreement with regard to or to direct the disposition of funds paid by [the Casino] pursuant to the Agreement or Amendments, without participation or approval of the Council, and the Defendants' defenses to that claim. The parties agree that the resolution of this issue shall not affect the performance of the existing Agreement or the Amendments in any way except as to a potential claim by the Council for repayment from the recipients of any funds transferred without authority, to be filed later, if this Court determines that the Mayor did not have authority to reach such an agreement or to direct the transfer of any funds." Appellant's App. at 237.

The order also withdrew the Council's request for a preliminary injunction. Pursuant to the order, the parties submitted

ever, in a county having a superior court that has three (3) or more judges, the petition shall be filed in the superior court and shall be heard and determined by the court sitting en banc." I.C. § 36-4-4-5(a) (Burns Code Ed. Repl.2000).

Stipulations of Fact to the trial court on October 17, 2002.

The parties filed briefs, and on November 22, 2002, the Lake Superior Court held an *en banc* hearing on the matter. Thereafter, on March 19, 2003, the trial court entered an order in favor of the Council. According to this Order:

"The two issues to be decided by the Court are 1) whether the Mayor has the authority to make a development agreement without the participation or approval of the Common Council, and 2) whether monies paid by the [Casino] under such agreement should be paid to the City of Hammond and only appropriated to other entities by ordinance of the Common Council." *Id.* at 12.

The order also stated:

"Given the language of the [Amendment], it is clear that the Mayor, on behalf of the City, bargained for cash in return for the city's rights concerning some of its property. The present case is therefore distinguishable from the Michigan case relied upon by the Mayor, and is not similar to the Mayor having received 'a grant of funds' to which the city was not otherwise entitled.

Because the Mayor was bargaining away the property interests of the City of Hammond when the Mayor entered into the [Amendment], any consideration received by virtue of the bargain was the property of the City of Hammond. Pursuant to I.C. 36–4–6–18, the Common Council has the authority to 'pass ordinances, orders, resolutions and motions for the government of the city, *the control of the city's property and finances,* and the appropriation of money,' therefore, the mayor could not dispose of city property *or the proceeds of such proper-*

*ty* without approval of the Common Council.

\* \* \*

Thus, neither the Mayor nor the Common Council could alter the requirements of state statutes and vest the legislature's authority to pass ordinances for the *control of the city's property and finances* to the executive branch.

\* \* \*

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the Mayor of the City of Hammond has no authority to enter into a contract or agreement on behalf of the City of Hammond without the Approval of the Common Council of the City of Hammond if the agreement transfers, encumbers or otherwise disposes of property rights belonging to the City of Hammond.

IT IS FURTHER ORDERED that the proceeds of any such contract or agreement entered into by the Mayor of Hammond on behalf of the City of Hammond, transferring, encumbering, or otherwise disposing of property rights of the City of Hammond, are subject to statutes requiring approval of the Common Council for appropriations and expenditures." *Id.* at 17–19 (emphasis in original).

It is from this order which the Mayor now appeals.

As stated, the Mayor claims upon appeal that the trial court's order is in error to the extent that it concludes that the Amendment transferred property rights belonging to the City because the Marina Parcel was owned by the HRA and leased to the HRC, and the City had no interest in the Marina Parcel.[5]

---

5. Co–Appellant, the HDC, has filed a separate appellant's brief in which it adopts the argu-

The parties disagree as to the standard of review applicable in this appeal. The Mayor claims that our standard of review should be a de novo review of contract interpretation, whereas the Council insists that we should apply a clearly erroneous standard upon review of specific findings and conclusions entered pursuant to Trial Rule 52(A).

 To the extent our decision is an interpretation of the Amendment, we will apply a de novo standard of review. *See Western Southern Life Ins. Co. v. Acton,* 779 N.E.2d 941, 943 (Ind.Ct.App.2002) (review of interpretation of unambiguous contracts is de novo), *trans. denied.* To the extent we interpret statutes, we likewise apply a de novo standard. *Cotton v. Ellsworth,* 788 N.E.2d 867, 869 (Ind.Ct.App. 2003). As to the Council's claim that we should apply a clearly erroneous standard to the trial court's findings and conclusions, we note that in the present case the parties stipulated to the relevant facts. The trial court's findings simply refer to these stipulations. No other evidence was introduced at the hearing or considered by the trial court. In such a situation, we are in as good a position as the trial court to determine the force and effect of such stipulations. *Poznic v. Porter County Dev. Corp.,* 779 N.E.2d 1185, 1188 (Ind.Ct. App.2002). Upon appeal from a judgment based upon stipulated facts there exists no

presumption in favor of the trial court's decision, and our review is de novo. *Id.*

The Council claims that we should not resolve the issues presented by the Mayor on the merits because he failed to present his current appellate argument to the trial court. Specifically, the Council claims that the Mayor never argued to the trial court that the Marina Parcel was not City property. Instead, according to the Council, the Mayor's argument at trial was that, even if the Marina Parcel were City property, he had the statutory authority to enter into the Amendment as the executive officer of the City.

 A party generally waives appellate review of an issue or argument unless that party presented that issue or argument before the trial court. *GKC Indiana Theatres, Inc., v. Elk Retail Investors, LLC,* 764 N.E.2d 647, 652 (Ind.Ct.App. 2002). However, we prefer to decide a case upon the merits whenever possible. *Bethlehem Steel Corp. v. Artim Transp. Sys., Inc.,* 430 N.E.2d 1185, 1187 (Ind.Ct. App.1982). As explained by the court in *Bielat v. Folta:*

"The rule that parties will be held to trial court theories by the appellate tribunal does not mean that no new position may be taken, or that new arguments may not be adduced; all that it means is that substantive questions in-

ment contained in the Mayor's brief. The HDC also argues that those portions of the trial court's order which conclude that the Amendment bargained away the City's property interests are dicta because the order uses conditional language. Specifically, the HDC claims that the order states that the Mayor was without authority to enter into a contract *if* the contract transfers City property rights without Council approval and that the Amendment clearly did not transfer or affect property rights belonging to the City. We disagree with this characterization of the trial court's order. The conclusion of the trial

court's order states that the Mayor has no authority without Council approval to enter into a contract which affects the property rights of the City, and the order clearly concludes that, in the Amendment, the Mayor did in fact "bargain[] for cash in return for the city's rights concerning some of its property." *Id.* at 17.

We conclude that the use of the conditional "if" in the order was merely a posing of the issue to be decided and that the decision of the trial court clearly found that City property rights were the subject matter of the Amendment.

dependent in character and not within the issues or not presented to the trial court shall not be first made upon appeal. Questions within the issues and before the trial court are before the appellate court, and new arguments and authorities may with strict propriety be brought forward." 141 Ind.App. 452, 454, 229 N.E.2d 474, 475 (1967). *Accord Leist v. Auto Owners Ins. Co.,* 160 Ind.App. 322, 328, 311 N.E.2d 828, 832 (1974); *Danes v. Auto. Underwriters, Inc.,* 159 Ind.App. 505, 509–10, 307 N.E.2d 902, 905 (1974).

■ Here, the Council notes that the complaint it filed contained no allegation that the Mayor was bargaining away the City's property rights. It also points out that the Mayor's answer did not claim that the Amendment did not bargain away the City's property rights. We, however, fail to see why or how the Mayor should have countered an argument that the Council did not make. Both parties at trial seemed to focus their arguments on the question of whether the Mayor had the authority to enter into the Amendment without reference to the question of whether or not City property was involved.

Nevertheless, the issue of whose property was being transferred by the Amendment seems to us to be inherent within the issue brought before the trial court—the authority of the Mayor to enter into the Amendment. Although the parties, somewhat surprisingly, seemed not to focus upon this threshold issue, the trial court rightly concluded that this issue was necessary to the resolution of the case before it. The trial court simply applied what it considered to be the applicable law to the facts before it, and we cannot fault it for doing so. Because this question was within the issue before the trial court, it is properly before us. *Bielat,* 141 Ind.App. at 454, 229 N.E.2d at 475.

■ As stated in *GKC Theatres,* the general rule that a party may not present an argument or issue to an appellate court unless the party presented the argument or issue to the trial court protects the integrity of the trial court, which should not be found to have erred as to an issue or argument that it never had an opportunity to consider. 764 N.E.2d at 651. This is not a concern in the present case because we are not faced with an issue that was not considered by the trial court. Indeed, the trial court appears to have been the first to fully face and address the important question of whose property was being transferred in the Amendment.

Neither are we faced with a situation in which the Council is unfairly surprised by the presentation of the issue. The issue was inherent in the resolution of the case. Moreover, the Council continually argued at the hearing that it had control over City property and finances. *Cf. Van Winkle v. Nash,* 761 N.E.2d 856, 860 (Ind.Ct.App. 2002) (crucial factor in determining whether a party may inject what appears to be a new issue into the appeal is whether the opposing party had unequivocal notice of the existence of the issue and an opportunity to defend against it).

This court has observed in the past that, although we will not usually decide the merits of an appeal upon grounds not argued by the parties nor submitted to the trial court, we are obligated to ascertain the correct law applicable to the facts if to do otherwise would be to render a clearly erroneous appellate decision. *Ayres v. Indian Heights Volunteer Fire Dep't., Inc.,* 482 N.E.2d 732, 737 (Ind.Ct.App.1985), *trans. granted, vacated on other grounds,* 493 N.E.2d 1229 (Ind.1986). Here, we are not deciding an issue based upon grounds not argued by the parties, and, although perhaps not precisely presented to the trial court, the issue was nevertheless ad-

dressed by the trial court.[6] For these reasons, we decline to hold that the Mayor has waived the appellate argument that the Marina Parcel was not City property.

The trial court's order states that the Mayor required the approval of the Council to enter into the Amendment if the agreement transfers, encumbers, or otherwise disposes of the City's property rights. Upon appeal, the Mayor does not challenge this conclusion on its face, but instead claims that the trial court's order is in error in that it also states that in the Amendment, "the Mayor, on behalf of the City, bargained for cash in return for the city's rights concerning some of its property." App. at 17. The Mayor argues that the Marina Parcel is not City property, and therefore the Amendment does not transfer, encumber, or dispose of City property.

The Mayor claims, and the Council does not dispute, that the Marina Parcel is owned by the HRA and was leased to the HRC. According to the Mayor, the only property rights affected by the Amendment were those belonging to the HRC and the HPA, which operated the Marina Parcel, but not the City. Therefore, the Mayor argues that he did not require the approval of the Council in order to enter into the Amendment.

The resolution of the case before us then depends upon the relationship between the HRC, the HPA, and the City. The Mayor claims that the HRC and HPA are separate, independent legal entities. The Council claims that the HRC and HPA are "legal fictions" and "schemes" to circumvent the debt limit provisions of Article 13, Section 1 of the Indiana Constitution and are actually part of the City. If so, the Council argues, the City has a property interest in the land transferred by the Amendment, and the Mayor required its approval to enter into the Amendment.

From a review of the chapter of the Indiana Code which governs redevelopment commissions, I.C. 36–7–14, it becomes apparent that a redevelopment commission is in several ways interrelated with city government.[7] The relevant question is not whether the HRC is entirely independent from the City government or is actually part of the City government; the relevant question is whether the City government has any control over the HRC with regard to the transaction involved in

---

6. We agree with the Mayor that, were we to apply waiver to a situation wherein a trial court based its judgment upon grounds not argued by the parties, the aggrieved party would be unable to challenge the judgment upon appeal, effectively insulating the victorious party.

7. For example, a redevelopment commission is considered the "department of redevelopment" for the unit in which it is located. I.C. § 36–7–14–3 (Burns Code Ed. Repl.1995). Each officer of the unit who has duties in respect to the funds and accounts of the unit shall perform the same duties with respect to the funds and accounts of the redevelopment commission, except as otherwise provided, and do so without any additional compensation. I.C. § 36–7–14–23 (Burns Code Ed. Repl.1995). There are several other statutes providing for various other interrelations between a redevelopment commission and the city government. *See e.g.,* I.C. § 36–7–14–25.5 (Burns Code Ed. Repl.1995) (unit may pledge certain revenues to pay amounts payable under I.C. § 36–7–14–25.1 providing for the issuance of bonds by the commission); I.C. § 36–7–14–28 (Burns Code Ed. Repl. 1995) (redevelopment commission's budget and tax levies subject to review and modification in the same manner as the budgets and tax levies formulated by executive departments of the unit); I.C. § 36–7–14–32.5 (Burns Code Ed. Supp.2003) (redevelopment commission may exercise power of eminent domain in the name of the unit); I.C. § 36–7–14–41 (Burns Code Ed. Repl.1995) (designation of economic development area by the redevelopment commission is subject to approval by the legislative body of the unit).

the Amendment, i.e., the lease of real property and control of the proceeds received therefrom.

Among the powers a redevelopment commission may exercise are the ability to:

"(1) Acquire by purchase, exchange, gift, grant, condemnation, or lease, or any combination of methods, any personal property or interest in real property needed for the redevelopment of blighted areas located within the corporate boundaries of the unit;

(2) Hold, use, sell (by conveyance by deed, land sale contract, or other instrument), exchange, lease, rent, or otherwise dispose of property acquired for use in the redevelopment of blighted areas on the terms and conditions that the commission considers best for the unit and its inhabitants;

(3) Sell, lease, or grant interests in all or part of the real property acquired for redevelopment purposes to any other department of the unit or to any other governmental agency for public ways, levees, sewerage, parks, playgrounds, schools, and other public purposes on any terms that may be agreed on . . . ."

I.C. § 36–7–14–12.2 (Burns Code Ed. Repl.1995).

Thus, a redevelopment commission may generally acquire and dispose of real estate without approval by any other body, including a city council.[8]

A redevelopment commission also has the ability to appoint a treasurer, and "[n]otwithstanding any other provision of this chapter, the treasurer has charge over and is responsible for the administration, investment, and disbursement of all funds and accounts of the redevelopment commission in accordance with the requirements of this chapter." I.C. § 36–7–14–8 (Burns Code Ed. Repl.1995). Thus, a redevelopment commission generally has the power to spend funds it receives without approval of any other government official or body.

█ The Council therefore has no authority to either approve or disapprove the HRC's subletting of the Marina Parcel or to control the funds it would receive from the lease. Yet, these statutes reveal that the HRC would also not require the Mayor's approval before entering into an agreement such as the Amendment at issue.[9] Of course, both the Mayor and

---

8. We recognize that under I.C. § 36–7–14–25.2 (Burns Code Ed. Supp.2003), if a redevelopment commission enters as a lessee into a lease which could be financed with the proceeds of bonds issued under Chapter 14, the lease may be entered into only after a public hearing, the adoption of a resolution by the commission, and the approval of the resolution by an ordinance of the fiscal body of the unit. Here, the Council is the fiscal body of the City of Hammond. *See* I.C. § 36–4–6–18 (Burns Code Ed. Repl.2000) ("The legislative body may pass ordinances, orders, resolutions, and motions for the government of the city, the control of the city's property and finances, and the appropriation of money."). However, under the Amendment, the HRC is the lessor to the Casino, which is the lessee, and Section 25.2 is inapposite.

9. This presents the question of, given the Mayor's limited authority over the ability of the HRC to control property and finances, why was the Mayor a party to the Amendment? The Mayor contends that he was involved with the execution of the Amendment because the City was a party to the underlying Agreement. He also contends that the Amendment obligates the City in other ways which do not amount to a transfer or disposal of City property rights. For example, under the Amendment, the City is required to cooperate with the Casino in obtaining permits, approvals, and authorizations to build a valet parking area on the Marina Parcel, cooperate in the zoning process, and cause other governmental entities to grant a right of entry or license so that the Casino could construct a new boat ramp on the Marina Parcel. In exchange, the Casino must get City approval for the site plan for the Marina Parcel.

Council have indirect control over the HRC through their respective power to appoint the board of the HRC.[10] *See* I.C. § 36–7–14–6.1(a) (Burns Code Ed. Repl. 1995).

Although neither party fully explains exactly what interest the HPA has in the Marina Parcel, we reach a similar conclusion with regard to any interest it may have. The HPA is a port authority created by the City under I.C. § 8–10–5–2(a) (Burns Code Ed. Repl.2000). As such, it "shall be a body corporate and politic which may sue and be sued, plead and be impleaded, and shall have the powers and jurisdiction enumerated in this chapter." *Id.* The HPA is controlled by a board appointed by the Mayor with the advice and consent of the Council. *See* I.C. § 8–10–5–5 (Burns Code Ed. Repl.2000). A port authority "shall have power to make and enter into any and all contracts in the name or names of the governmental unit or units creating such authority, and such contracts as may be necessary to effectuate the purposes of this chapter and which are not otherwise expressly provided for shall be made without ratification thereof by any other board, body, or officer." I.C. § 8–10–5–2(b). Pursuant to I.C. § 8–10–5–8 (Burns Code Ed. Repl.2000), a port authority has the full power and authority to do several things, including:

"(1) Purchase, construct, sell, lease, and operate docks, wharves, warehouses, piers, and other port, terminal, or transportation facilities within its jurisdiction consistent with the purposes of the port authority and make charges for the use thereof.

* * *

(5) Acquire, own, hold, sell, lease, or operate real or personal property for the authorized purposes of the port authority.

* * *

(6) With the approval of the governing body creating it, sell, lease, or enter into a royalty contract for the natural or mineral resources of land which it owns. Moneys received from these sources shall be deposited in the nonreverting capital fund of the port authority.

* * *

(12) Sell or lease real and personal property not needed for the operation of the port authority and grant easements or rights-of-way over property of the port authority."

In this list of enumerated powers, the Council, as the governing body creating the HPA, has the power of approval only over royalty contracts for natural or mineral resources. This is certainly not implicated by the Amendment. We conclude from these statutes that, whatever interest held by the HPA, the Council had no authority to require approval of the Amendment to the extent the HPA's interests are affected.

The Council also argues that the City has some contingent interest in the Marina Parcel because the "real estate may be owned in the name of the City of Hammond." Appellee's Brief at 22. However, the Council cites no authority for such speculation. *See Cuto v. State,* 709 N.E.2d

---

**10.** We further observe that a redevelopment commission may delegate to an executive department of the unit, or any governmental entity, any of the powers or functions of the commission with respect to the planning or undertaking of an urban renewal project in the area in which that department or entity is authorized to act. I.C. § 36–7–14–33 (Burns Code Ed. Repl.1995).

356, 365 (Ind.Ct.App.1999) (courts do not engage in speculation upon review). The Council also argues that the City has a contingent interest in the Marina Parcel, because when a port authority is dissolved, any property belonging to the port authority shall be transferred to the authority which created it. *See* I.C. § 8–10–5–4 (Burns Code Ed. Repl.2000). Be that as it may, the HPA has not been dissolved, and the Marina Parcel is owned by the HRA and leased to the HRC. Regardless of any possible contingent interest in the Marina Parcel by the City, this is irrelevant to the question before us. The Amendment calls for the transfer of a leasehold interest in the Marina Parcel. Any reversionary interest held by the City is unaffected by such a transfer. The leasehold interest is held by the HRC, and the relevant statutes grant the HRC the power to transfer such without approval of the Council.

The Council lastly argues that property rights other than ownership of real estate are involved in the Amendment. Whether this is so or not, such would be relevant to the question before us only to the extent that the Amendment transferred, encumbered, or otherwise disposed of such City property rights. The Council claims that, under the original Agreement, the City has a "property interest in the nature of contractual rights...." *Id.* at 24. It also phrases this right as a "property interest as a riverboat host city." *Id.* However, the heart of the Amendment is the option to sublease the Marina Parcel and the development thereon. The Council fails to explain how the Amendment transfers, encumbers, or disposes of any property interest it had under the Agreement.

The Council's argument that the Mayor's presumed role in selecting the distribution of the funds paid by the Casino in the Amendment creates a testamentary power of appointment, which is a property right, must also fail. This argument is made in two sentences, without any citation to authority. The Council asks us to presume that the Mayor had a role in the distribution of the funds, which we will not do. *See Cuto,* 709 N.E.2d at 365. Even if we accepted the Council's position, the Amendment creates the powers it refers to; it does not transfer, encumber, or dispose of them.

We therefore hold that the trial court's order is erroneous to the extent that it concludes that the Amendment transferred, encumbered, or otherwise disposed of a property right belonging to the City which would require the Council to approve the Amendment.[11]

The judgment of the trial court is reversed, and the cause is remanded for proceedings not inconsistent with this opinion.

RILEY, J., and MATHIAS, J., concur.

11. We hereby deny the Mayor's motion to supplement the record with the trial court's order of October 3, 2003 denying the Council's motion to enforce the declaratory judgment. The Council's motion to consolidate its appeal of the October 3 order with the present case is also hereby denied.