John E. NANCE, Georgia G. Nance, and John E. Nance, Georgia G. Nance d/b/a Pipe Creek Sand & Gravel, Appellants–Respondents,

v.

MIAMI SAND & GRAVEL, LLC, Appellee–Petitioner.

No. 48A02–0312–CV–1104.

Court of Appeals of Indiana.

April 14, 2005.

828

Martin E. Risacher, Eric M. Douthit, Church, Church, Hittle & Antrim, Noblesville, IN, Attorneys for Appellants.

Ralph E. Sipes, Busby Austin Cooper & Farr, Anderson, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

John and Georgia Nance appeal the trial court's judgment holding them jointly and severally liable, along with their son and daughter-in-law, Nick and Tonia Nance, to Miami Sand and Gravel, LLC ("Miami") for damages arising out of a failed business enterprise. We affirm in part, reverse in part, and remand.

### Issues[1]

The restated issues before us today are:

I. whether the Comparative Fault Act required the trial court to apportion damages among John, Georgia, Nick, and Tonia;

II. whether the trial court's findings and conclusions are sufficient to impose liability against John and Georgia for conversion, trespass, and contempt of court;

III. whether the trial court properly calculated attorney fees owed to Miami by John and Georgia;

IV. whether the trial court properly held John and Georgia liable for various "costs"; and

V. whether the scope of a permanent injunction entered against John and Georgia is overly broad.

### Facts

John and Georgia own land in Madison County, on which is located a gravel pit. Over the years, John and Georgia periodically had attempted to turn the pit into a profitable mining operation. In 1998, Nick and Tonia formed N & N Sand and Gravel ("N & N") for this purpose; John and Georgia loaned Nick and Tonia substantial funds to carry out the operation. However, N & N failed to earn a profit in 1999 and 2000. In 2000, Nick met Mike Pettijohn. The two agreed to form Miami, a new company created to mine gravel from the pit. At the time, Nick grossly exaggerated to Pettijohn the amount of gravel he had been excavating from the pit. Miami was formed as an LLC, with one member being N & N and the other being Central Indiana Sand & Gravel, LLC ("Central Indiana"), a company formed by Pettijohn and two of his relatives.

John and Georgia executed a twenty-year lease giving Miami the exclusive right to mine the gravel pit. The lease required Miami to pay royalties to John and Georgia for minerals sold from the premises at the rate of 20 cents per ton. The lease also provided that the weight of materials was to be measured by scales installed by Miami on the premises. Nick and Tonia were employees of Miami and ran day-to-day operations at the gravel pit.

The Miami business venture quickly deteriorated. From the outset, Miami's operations were being financed almost entirely by cash contributions from Central Indiana and Pettijohn's other businesses,

---

1. We hereby deny John and Georgia's motion to strike Miami's Notice of Additional Authority and Appellee's Appendix.

with little or no contribution from N & N. Nick and Pettijohn also had disagreements about whether to focus on excavating and selling gravel or dirt. The Department of Natural Resources temporarily shut down Miami's operations because it lacked a mining permit. Immediately after obtaining the permit, the Mining Safety and Health Administration shut down operations because of safety violations. There were frequent disputes between Tonia, who handled "on-the-scene" paperwork related to the gravel pit's finances, and Susie Pettijohn, who did the same for Central Indiana and Miami, relating to Tonia's poor record keeping.

Nick's and Tonia's activities became more and more questionable sometime in 2001. For example, Nick began requesting that Gary Sexton, a customer who frequently purchased dirt from the pit, make his checks out to N & N, rather than Miami. Nick also told Sexton, who purchased approximately $5000 in dirt every week from the pit, that he intended to "bleed" Pettijohn financially until he abandoned his interest in Miami. App. p. 53. Eventually, Sexton refused to purchase any more dirt from the pit while Nick and Pettijohn were "feuding." *Id.*

In July 2001, Nick and Tonia opened a bank account they called "Our Miami." They then proceeded to divert several thousand dollars in sales receipts for purchases from the gravel pit into this account instead of forwarding the money to Miami as required. Three checks payable to Nick for his purported salary, one payable to cash, and one payable to a third party were drawn on this account. Additionally, Tonia faxed copies of the sales receipts to Susie Pettijohn for the purpose of calculating royalties Miami owed to John and Georgia. Miami made the royalty payments, but did not actually receive the funds for these sales. The evidence and

the trial court's findings give no indication that John and Georgia were aware of or involved in the "Our Miami" account.

Also, on July 19, 2001, John and Georgia opened a bank account they called "John Nance d/b/a Pipe Creek Sand & Gravel" ("Pipe Creek"). Through Tonia, John and Georgia deposited $524.69 into this account from sales at the pit that should have gone directly to Miami. On July 25, 2001, however, John and Georgia closed this account.

Also on July 25, 2001, Pettijohn terminated Nick's employment with Miami for misappropriating funds and other reasons. On July 26, Nick drove John to Miami's office, where John returned to Pettijohn the $524 he had deposited in the "Pipe Creek" account. Nick also signed and gave Pettijohn an affidavit swearing, falsely, that the $524 represented the return of all money he had improperly diverted from Miami.

On July 27, John, Georgia, Pettijohn, Susie, and two attorneys met to discuss Miami and the overall mining operations. At that meeting, the parties discussed the difficulties Miami had had in installing operational scales at the gravel pit by which materials removed from the pit could be weighed and royalties owed to John and Georgia calculated on that basis, as provided by the mining lease. John and Georgia had been accepting royalty payments from Miami on a per-truckload and estimated weight basis and agreed to continue doing so until scales could be installed. John and Georgia also said that they wanted Miami to continue mining the pit without Nick's involvement. However, by July 31, John and Georgia indicated they had changed their minds and wanted Miami to cease operations and be held in breach of the lease for failing to install scales at the pit.

The antagonism among the parties continued. On August 7, 2001, Pettijohn and

his brother went to the pit. The Petti-johns were working at the pit when Nick and an unidentified individual drove onto the property behind some weeds, fired a gunshot, then left the property. Later, after the scales had been installed at the pit, UPS delivered weigh tickets for the scales to John and Georgia's house instead of to the pit office 200 yards away. Tonia was there at the time and advised Georgia to return the tickets to UPS and have them re-sent to the pit, rather than simply walking them to the pit herself.[2]

On August 10, 2001, Miami filed a multi-count complaint against N & N, Nick, Tonia, John, and Georgia. It alleged inter alia that the parties were jointly and severally liable to Miami for conversion and trespass. It also sought to enjoin the parties from interfering with Miami's operation of the gravel pit. In their answer filed separately from Nick and Tonia, John and Georgia denied any wrongdoing. They also filed a cross-complaint, alleging that Miami was in breach of the mining lease. Nick and Tonia raised several cross-claims of their own alleging fraud and conversion by Pettijohn and Miami, and seeking dissolution of Miami and a restoration of assets to N & N.

After hearing evidence over the course of several days of trial spanning from May 7 to October 2, 2003, the trial court entered detailed findings of fact and conclusions thereon pursuant to Miami's request. It found John, Georgia, Nick, and Tonia jointly and severally liable to Miami for conversion in the total amount of $11,701.02. This amount includes $524.69 John and Georgia deposited in the "Pipe Creek" account and $3,375.65 Nick and Tonia deposited in the "Our Miami" account for a total of $3,900.34, which the trial court trebled pursuant to the civil conversion statute. Also pursuant to the civil conversion statute, the trial court assessed various items of "costs" against John, Georgia, Nick and Tonia, as well as 75% of Miami's "reasonable attorney fees as proven in this case" amounting to $77,388.20. App. p. 59. The trial court also held John, Georgia, Nick, and Tonia jointly and severally liable for Nick's having caused Sexton to stop buying dirt from the pit at a cost to Miami of $5000 per week; the trial court characterized this as trespass and assessed total damages at $50,000. The trial court also found that all of the Nances had engaged in various questionable litigation tactics throughout this case and found them in contempt of court; it assessed a fine of $20,000 payable to Miami for which the Nances were all jointly and severally liable. John and Georgia also were permanently enjoined from entering the leasehold property and from doing any act "asserting title to or right to possession of the leasehold property" during the lease's period, which the trial court extended by two years. App. p. 88. In addition, the trial court found against the Nances on all of their cross-claims and dissociated N & N from Miami but did not dissolve Miami, pursuant to which N & N, Nick, and Tonia only were held liable to Miami for a negative capital account of $63,543. John and Georgia now appeal.[3]

## I. Joint and Several Liability

■ John and Georgia's first argument is that the Comparative Fault Act has

---

**2.** There were numerous other findings of questionable conduct by Nick and Tonia that are not directly relevant to this appeal.

**3.** Nick and Tonia, who were represented separately from John and Georgia at trial, have not participated in this appeal or initiated their own appeal. Because they were parties below, however, they are still parties in this appeal. See State v. Nixon, 270 Ind. 192, 194, 384 N.E.2d 152, 153 (Ind.1979); Ind. Appellate Rule 17(A).

abolished joint and several liability in Indiana. They contend this point was made clear in *Control Techniques v. Johnson*, 762 N.E.2d 104, 109 (Ind.2002). Specifically, John and Georgia argue the trial court essentially was required to assign percentages of fault to John, Georgia, Nick, and Tonia, and apportion the damages that each owed to Miami on that basis, and that the trial court erred in imposing joint and several liability for the damages it calculated Miami had suffered.

[2–4] This argument, however, was never presented to the trial court. "A party generally waives appellate review of an issue or argument unless that party presented that issue or argument before the trial court." *Dedelow v. Pucalik*, 801 N.E.2d 178, 183 (Ind.Ct.App.2003). This rule protects the integrity of the trial court, which should not be found to have erred as to an issue or argument that it never had an opportunity to consider. *Id.* at 184. Waiver may be avoided if the newly-raised issue was inherent in the resolution of the case, the other party had unequivocal notice of the issue below and had opportunity to litigate it, and/or if the trial court actually addressed the issue below in the absence of argument by the parties. *Id.* at 184–85.

Here, Miami's original complaint specifically alleged that John, Georgia, Nick, and Tonia were jointly and severally liable for damages caused to Miami. John and Georgia never argued to the trial court that joint and several liability was impermissible in this case, although they had ample opportunity to do so and were on notice that Miami was seeking to impose joint and several liability. The trial court was presented with no argument that it could not impose joint and several liability as a matter of law. We must conclude that John and Georgia have waived on appeal any argument that the Comparative Fault Act required the trial court to apportion damages among John, Georgia, Nick, and Tonia.

## II. Sufficiency of the Evidence and Findings

[5, 6] Miami requested that the trial court issue findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52. "When properly requested, a trial court is required to make complete special findings sufficient to disclose a valid basis under the issues for the legal result reached in the judgment." *Fobar v. Vonderahe*, 756 N.E.2d 512, 518 (Ind.Ct.App.2001), *summarily aff'd in relevant part*, 771 N.E.2d 57, 60 (Ind.2002). "The purpose of findings of fact and conclusions of law is to provide the parties and reviewing courts with the theory upon which the case was decided." *Id.*

[7, 8] In reviewing a judgment entered with Trial Rule 52 findings at a party's request, we must determine whether the evidence supports the trial court's findings and whether the findings support the judgment. *Weiss v. Harper*, 803 N.E.2d 201, 205 (Ind.Ct.App.2003). "We will not disturb the trial court's findings or judgment unless they are clearly erroneous." *Id.* We neither reweigh evidence nor judge the credibility of witnesses, but will consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id.* Additionally, we may not add anything to the special findings of fact by way of presumption, inference, or intendment. *Id.* The present case will be resolved primarily on the basis of whether the trial court's findings support its conclusions and judgment, and not so much on whether the evidence supports the findings.

### A. Conversion and Trespass

[9–12] Assuming, without deciding, that joint and several liability was properly

invoked in this case, this is not the end of the story with respect to the extent of John's and Georgia's liability to Miami. Imposing joint and several liability on a defendant still requires some degree of individual wrongdoing or reason to impose liability on that defendant, unless there is proof of a principal-agent relationship between two defendants. Joint liability may be established if the acts of various tortfeasors through cooperation or in concert accomplish a particular wrong. *Young v. Hoke*, 493 N.E.2d 1279, 1280 (Ind.Ct.App. 1986), *trans. denied.* Additionally, joint liability may be premised upon independent acts that combine to produce a single injury. *Id.* Where one alleged tortfeasor is not responsible for an injury, however, there can be no joint liability. *Dow Chemical Co. v. St. Vincent Hosp. and Health Care Center, Inc.*, 553 N.E.2d 144, 147 (Ind.Ct.App.1990). Apart from the concept of joint tortfeasors, joint and several liability may be imposed in cases of vicarious liability premised upon an agency relationship among multiple defendants. *See Henry B. Steeg & Associates, Inc. v. Rynearson*, 143 Ind.App. 567, 570, 241 N.E.2d 888, 890 (1968).

In the present case, the trial court imposed joint and several liability on John, Georgia, Nick, and Tonia for what amounted to several distinct wrongful acts and resulting injuries. We disagree with Miami's broad assertion that "[i]t is impossible to say exactly which of the multitude of injuries Miami proved were caused by any individual actor." Appellee's Br. p. 23. This was a case in which Miami suffered several separate and distinct injuries, rather than a single indivisible injury. Thus, as for the separate injuries, there either needed to be evidence of concerted action or independent fault, or the existence of an agency relationship, among John, Georgia, Nick, and Tonia before they could all be held jointly and severally liable for each of those separate injuries.

The first source of injury was Nick's and Tonia's depositing money that should have gone directly to Miami into their "Our Miami" account, which constituted conversion. Second, Miami suffered injury (albeit very slight, as we will discuss) when John and Georgia deposited money that should have gone directly to Miami into their "Pipe Creek" bank account. Third, Miami suffered injury when Nick effectively "drove off" a regular customer who had been buying approximately $5000 per week in dirt from the pit, which injury the trial court characterized as trespass and found injured Miami in the amount of $50,000.

■■■ The trial court's findings do not support a conclusion that John and Georgia had any knowledge of or involvement with Nick's and Tonia's "Our Miami" account. They also do not support a conclusion that John and Georgia had anything to do with Sexton's decision to stop purchasing dirt from the pit. Although it is true that John and Georgia received royalties from Miami on sales of materials the proceeds of which Nick and Tonia improperly diverted into the "Our Miami" account, there is no finding that John and Georgia were aware of the account. Nor is there any finding that Nick and Tonia transferred money to John and Georgia from that account. In other words, there is no finding indicating that John and Georgia were aware Miami was paying them royalties on sales for which Miami itself was not being paid. With respect to the $50,000 "trespass" claim, the findings indicate that it was solely Nick's actions, in frequently lambasting Pettijohn and requesting that payments be made to N & N rather than Miami, that caused Sexton to stop buying dirt from the pit. To the extent Nick's actions in "scaring off" Sexton may properly be construed as "tres-

pass" as opposed to, perhaps, tortious interference with a business relationship, there is no evidence John or Georgia were involved in these actions.[4]

[15–17] There is sufficient evidence that John and Georgia were aware it was improper to deposit the $524 into the "Pipe Creek" bank account that they had opened, rather than giving the money directly to Miami. This constituted conversion. However, the trial court also found that John returned this money to Miami seven days after opening the "Pipe Creek" account and depositing the money there. We observe that with respect to a conversion claim, damages are restricted to actual losses sustained as a proximate result of the conversion and damages are mitigated by return of the property to the owner. *Coffel v. Perry*, 452 N.E.2d 1066, 1069 (Ind.Ct.App.1983). "Where converted property is returned, damages for the deprivation of the use of the property may be measured by the fair rental value for the period of conversion." *Id.* The equivalent of "fair rental value" where money is concerned would be interest. We agree with John and Georgia that the trial court erred in holding them liable to Miami for the entire $524 they improperly deposited in the "Pipe Creek" account because that money was returned to Miami. Any interest that would have accrued during the time of the conversion would be the proper measure of damages.

[18] Because there is evidence John, Georgia, Nick, and Tonia may have all acted together with respect to the "Pipe Creek" account, they may be held jointly and severally liable in damages related to that account. With respect to the "Our Miami" account and the trespass claim,

there are no findings sufficient to support the conclusion that John and Georgia acted in concert with Nick and Tonia, or that they acted independently of each other yet caused a single indivisible injury. To the extent Miami claims there was evidence that John, Georgia, Nick, and Tonia acted together in a civil conspiracy, as agents of each other, or as joint venturers, the trial court made no findings that would support joint and several liability under any of these theories. We cannot look beyond the trial court's findings for any evidence in the record that might conceivably support the judgment, but instead we are limited to reviewing the findings. *See W & W Equipment Co., Inc. v. Mink*, 568 N.E.2d 564, 572 (Ind.Ct.App.1991), *trans. denied.* It would appear Miami primarily is asking us to hold John and Georgia jointly and severally liable with Nick and Tonia for their wrongdoing because of the parties' close family relationship. Miami cites no authority that would support the imposition of vicarious liability on the basis of family relationship, and in fact cases support the opposite proposition. *Cf. Nwannunu v. Weichman & Associates, P.C.*, 770 N.E.2d 871, 878 (Ind.Ct.App. 2002) (holding marriage does not automatically create agency relationship between husband and wife; "[i]mplied authority for a husband to act as the agent for his wife must be discerned from acts and conduct, and not merely from the marriage relationship.").

We reverse the judgment against John and Georgia in its entirety as it relates to conversion damages arising from Nick and Tonia depositing money in the "Our Miami" account and in Nick "trespassing" and causing Sexton to cease spending $5000

---

4. The only possible occurrence of trespass by John happened during the course of the litigation, when he entered onto the property, on the advice of counsel and accompanied by a sheriff's deputy, to take photographs. This occurrence did not figure into the trial court's damages calculation.

per week at the pit. There are insufficient findings to support a conclusion to hold John and Georgia liable for these acts. We reverse and remand for a recalculation of damages related to the "Pipe Creek" account and the extent to which John and Georgia should be held liable in conversion for temporarily depositing Miami's funds in that account. The findings do not support holding John and Georgia liable for the full $524 they temporarily withheld from Miami.

### B. Contempt

[19–21] John and Georgia next challenge the trial court's sua sponte decision to impose a $20,000 fine, payable to Miami, for their purported contemptuous conduct during the course of litigation. Miami has not responded to this claim in any meaningful way.[5] An appellee's failure to respond to an issue raised in an appellant's brief is, as to that issue, akin to failing to file a brief. *Cox v. State*, 780 N.E.2d 1150, 1162 (Ind.Ct.App.2002). Although this failure does not relieve us of our obligation to correctly apply the law to the facts in the record in order to determine whether reversal is required, counsel for the appellee remains responsible for controverting arguments raised by the appellant. *Id.* For us to reverse on this issue, John and Georgia must establish only that the lower court committed prima facie error. *See id.* "Prima facie means at first sight, on first appearance, or on the face of it." *Id.*

The trial court entered several findings outlining questionable conduct by John, Georgia, Nick, and Tonia during the prosecution of this case that may have contributed to delays in its resolution, obfuscation of discovery requests, disruption of court proceedings, and the like. We cannot say these findings are clearly erroneous. However, the trial court entered no findings as to how this conduct caused damage to Miami in the amount of $20,000.

We observe that the primary objective of a civil contempt proceeding is not to punish the contemnor, but to coerce action or to compensate an aggrieved party.[6] *Evans v. Evans*, 766 N.E.2d 1240, 1245 (Ind.Ct.App.2002). Punitive damages are not properly imposed in a civil contempt proceeding, and any damages awarded for contempt in this case must reflect Miami's actual damages as a result of John's and Georgia's purported contemptuousness.[7] *See id.* "Actual dam-

---

5. The full extent of Miami's argument on this issue is that "John and Georgia's remaining issues all beg the Court to reweigh the evidence and to judge the credibility of witnesses to determine the evidence does not support the findings, and the findings do not support the conclusions of law upon which the judgment was entered." Appellee's Br. p. 26. Miami never mentions the contempt award, nor cites to any findings or portions of the record that support it, nor cites any legal authority specific to contempt awards. This does not constitute cogent argument. *See Coca–Cola Co. v. Babyback's Intern., Inc.*, 806 N.E.2d 37, 49 n. 12 (Ind.Ct.App.2004), *trans. denied.* The failure to make a cogent argument is equivalent to a failure to file a brief. *Bright v. Kuehl*, 650 N.E.2d 311, 317 (Ind.Ct. App.1995).

6. The trial court's findings suggest that while some of the Nances' conduct occurred outside court and thus would constitute at most indirect contempt, some of the conduct occurred during court proceedings. Courts may summarily punish such disruptive conduct as direct criminal contempt in order to protect the dignity of the court and its proceedings. *In re Nasser*, 644 N.E.2d 93, 95 (Ind.1994). Here, the court did not specify that it was imposing criminal contempt sanctions and the fine was payable to Miami, not the court. In the absence of any argument by Miami to the contrary, we will analyze this issue as one concerning the propriety of a civil contempt award.

7. Because this case had proceeded to final judgment when the contempt order was issued, the fine cannot be construed as intend-

ages" means "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses." *Id.* at 1245 n. 7 (quoting Black's Law Dictionary 394 (7th ed.1999)). The amount of damages does not lie in the discretion of the court and the loss must be established by satisfactory evidence. *Id.* at 1245. "Any type of fine or imprisonment not for the aggrieved party's benefit must be considered punitive in nature and not properly imposed in a civil contempt proceeding." *National Educ. Association—South Bend v. South Bend Community School Corp.,* 655 N.E.2d 516, 522 (Ind.Ct.App.1995).

Here, the trial court entered no findings indicating that John's and Georgia's alleged contemptuous behavior caused actual damage to Miami. Additionally, Miami has not directed us to any evidence in the record that would support any finding in that regard. Such a finding or such evidence was required to support the imposition of a civil contempt fine against John and Georgia. Applying the prima facie error rule, we reverse the trial court's awarding of the $20,000 contempt fine in favor of Miami.

### C. Attorney Fees

John and Georgia also contend that assuming there was sufficient evidence to support a conversion claim against them, the trial court erred in calculating the amount of attorney fees to which Miami was entitled. As with the contempt argument, Miami has not presented us with any cogent argument to rebut John's and Georgia's arguments. The prima facie error rule again applies.

[29, 30] The sole legal and factual basis the trial court cited for awarding attorney fees to Miami was Indiana Code Section 34–24–3–1, which provides for such an award if the plaintiff proves pecuniary loss as the result of conversion. We observe that "[a]n award of attorney fees is appropriately limited to those fees incurred because of the basis underlying the award." *Brant v. Hester,* 569 N.E.2d 748, 755 (Ind. Ct.App.1991). The party requesting an assessment of attorney fees bears the burden of proving an appropriate allocation of fees between issues for which attorney fees may be assessed and those for which they may not. *Shell Oil Co. v. Meyer,* 684 N.E.2d 504, 524–25 (Ind.Ct.App.1997), *summarily aff'd in relevant part,* 705 N.E.2d 962, 981 (Ind.1998). "While a perfect breakdown is neither realistic nor expected, a reasonable, good faith effort is anticipated." *Id.* at 525.

[31] In the present case, the conversion claim against John and Georgia was but a small fraction of the entire litigation and, on remand, we anticipate that the damages for this claim will be minute. As noted, there were numerous collateral issues including those regarding misconduct by Nick and Tonia only, ending N & N's participation in the Miami LLC, and a cross-claim by John and Georgia that Miami had breached its lease. The trial court entered no findings or conclusions that John and Georgia should be liable for Miami's attorney fees for any reason other than the civil conversion statute. Miami, however, made no attempt to allocate its attorney fees so as to separate those related to the conversion claims from those related to prosecuting or defending other issues. It was Miami's burden to do so. Therefore, applying the prima facie error rule, we remand for a further hearing as to the fees Miami reasonably incurred in prosecuting its conversion claims. *See Brant,* 569 N.E.2d at 755. Furthermore, we believe it is appropriate in the present

ed to coerce action on John's and Georgia's part.

case to attempt some allocation between John and Georgia versus Nick and Tonia for these fees, again noting that there are no findings sufficient to indicate John and Georgia had any involvement with Nick and Tonia's diversion of Miami funds into the "Our Miami" account.

### D. Costs

John and Georgia next argue the trial court erred in awarding various "costs" against them and in favor of Miami. These items include $564.59 for mediation expenses, $300 Miami had to pay to obtain a $100,000 letter of credit in order to remain operational while the litigation was pending, $3352.18 for deposition expenses, $69.23 for photocopying, and $104 in court costs. The trial court awarded these "costs" as part of Miami's conversion damages. The trial court also separately awarded Miami $17,754.59 for the cost of installing scales near the gravel pit. Once again, Miami has not responded to this claim with cogent argument, and the prima facie error rule applies. We conclude that only one of these items of "costs" was properly charged to John and Georgia.

 Under Indiana Code Section 34–24–3–1, a party who suffers a pecuniary loss as the result of conversion is entitled to recover from a defendant the "costs of the action" as well as "other reasonable costs of collection." This court has narrowly construed this statute because it is penal in nature. *See Johnson v. Naugle,* 557 N.E.2d 1339, 1344 (Ind.Ct.App.1990). We have held that "costs of the action" only includes filing fees and statutory witness fees. *See Roake v. Christensen,* 528 N.E.2d 789, 792 (Ind.Ct.App.1988). Additionally, "costs of collection" include costs associated with pre-judgment garnishment, proceedings supplemental, sheriff's sales, and other costs directly associated with collecting a judgment. *See Johnson,*

557 N.E.2d at 1346. It does not include such things as legal research costs, telephone calls, mileage, depositions, postage, copies, process servers, and videotaping. *Id.*

 Pursuant to this clear precedent, Miami was not entitled to recover costs associated with mediation sessions, depositions, photocopying, and obtaining a letter of credit; Indiana Code Section 34–24–3–1 only authorized the imposition of $104 in court costs. As for the $17,754 cost associated with installing the scales, the trial court entered no findings or conclusions that indicate why it was holding John and Georgia liable for that expense. The mining lease expressly required Miami to install the scales and Miami never denied that it was required to do so. The dispute in this case regarding the scales was whether Miami was in breach of the mining lease because it temporarily paid royalties to John and Georgia by the truckload rather than by precise weight while it went through the process of installing the scales. The trial court found this was not a breach because John and Georgia regularly had accepted and even demanded the by-the-truckload royalties. We conclude, however, that this is insufficient to shift the cost of eventually installing the scales onto John and Georgia. Again applying the prima facie error rule, we reverse the trial court's awarding of the above-delineated "costs" to Miami, with the exception of $104 in court costs.

### E. Permanent Injunction

John and Georgia's final argument is that the scope of the permanent injunction the trial court entered is overly broad with respect to them. Again, there is no cogent response from Miami to this argument, and we may reverse upon a showing of prima facie error.

[35–37] Permanent injunctions are limited to prohibiting injurious interference with rights. *Ferrell v. Dunescape Beach Club Condominiums Phase I, Inc.,* 751 N.E.2d 702, 713 (Ind.Ct.App.2001). An injunction must be narrowly tailored so that its scope is never more extensive than is reasonably necessary to protect the interests of the party in whose favor it is granted. *Groff v. City of Butler,* 794 N.E.2d 528, 535 (Ind.Ct.App.2003). "Furthermore, an injunction should not be so broad as to prevent the enjoined party from exercising his rights." *Id.*

John and Georgia specifically challenge the following provisions of the permanent injunction:

> 82. The following persons are permanently enjoined from entering in or on any part of Petitioner MIAMI's mineral estate for the duration of the period that the Mining Leasehold of Petitioner MIAMI remains in force: ... JOHN E. NANCE, and GEORGIA G. NANCE....

* * * * * *

> 85. Respondents ... JOHN E. NANCE, and GEORGIA G. NANCE are permanently enjoined for the duration of the period that the Mining Leasehold of Petitioner MIAMI remains in force from performing any act or acts either as previously specified or any other act or acts asserting title to or right to possession of the leasehold property.

App. pp. 87–88.

[38] We agree that these provisions are unnecessarily broad. The first provision essentially duplicates another provision in the injunction that prohibits Nick and Tonia from entering the leasehold property, but also states that John and Georgia "have only the rights to enter the pit as set out in the Mining Lease and only for the purposes stated therein." App. p.

86. This provision, number 76, properly recognizes that as landlords, John and Georgia retain certain limited rights with respect to entering the leasehold property. Provision 82 does not, and we direct the trial court to rewrite it so that it conforms with provision 76 and permits John and Georgia to enter the leasehold property as permitted by the mining lease.

[39] Provision 85 is overly broad in that, on its face, it would preclude John and Georgia from ever asserting their rights under the mining lease. For example, taken literally Miami could refuse to pay John and Georgia any more royalties for mining the pit, a clear violation of the lease, but John and Georgia would be precluded from suing Miami for breaching the lease because that would constitute an act "asserting title to or right to possession of the leasehold property." *Id.* p. 88. As with provision 82, we direct the trial court to rewrite provision 85 so that John and Georgia are permitted to exercise their rights to the property as provided by the mining lease.

### Conclusion

Our resolution of the various issues requires us to delineate carefully the effect of our decision. John and Georgia are only liable in conversion to Miami for the $524 they temporarily deposited in the "Pipe Creek" account, and the amount of damages is the interest accrued during the period of conversion, not the full $524. We remand for calculation of that amount, for which John, Georgia, Nick, and Tonia may be jointly and severally liable. The judgment against John and Georgia for conversion related to the "Our Miami" account and for trespass is reversed in its entirety as to them, but remains as to Nick and Tonia. The $20,000 contempt fine is reversed in its entirety as to all parties because of a lack of evidence or findings

that Miami suffered damages in that amount as a result of the purported contempt. We reverse the attorney fees award against all parties and remand to give Miami an opportunity to allocate attorney fees related only to its conversion claims. The award of "costs," except for $104 in court costs, is reversed with respect to all parties. The permanent injunction against John and Georgia must be modified in accordance with this opinion, but is otherwise affirmed. The judgment is also affirmed with respect to the $63,543 entered against only Nick, Tonia, and N & N.[8]

Affirmed in part, reversed in part, and remanded.

MAY, J., and DARDEN, J., concur.

---

8. Given the result of this appeal, we deny Miami's request to assess appellate attorney fees against John and Georgia.