## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 02 2018, 7:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Craig R. Persinger
Marion, Indiana

ATTORNEY FOR APPELLEE

Ryan S. Prinkey
Union City, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Richard Clifton,

*Appellant-Defendant,*

v.

James E. Wright,

*Appellee-Plaintiff.*

October 2, 2018

Court of Appeals Case No.
18A-CC-88

Appeal from the Jay Superior
Court

The Honorable Marianne L.
Vorhees, Special Judge

Trial Court Cause No.
38D01-1505-CC-71

**Robb, Judge.**

# Case Summary and Issue

[1] Following a bench trial, Richard Clifton appeals from the trial court's $5,984 judgment in favor of James E. Wright. Clifton presents two questions for our review which we consolidate and restate as whether the trial court's judgment was clearly erroneous. Concluding the trial court's judgment was not clearly erroneous, we affirm.

# Facts and Procedural History

[2] On April 29, 2013, Wright and his wife, Cynthia, entered into a purchase agreement with Thomas B. Emerick to buy real property located on West Arch Street in Portland, Indiana, for the price of $61,000.[1]

[3] The purchase agreement allowed for Wright to conduct an independent inspection of the property and if the inspection revealed a "major defect[,]" Emerick would have the opportunity to remedy the defect prior to closing. Exhibits at 5. Wright, however, retained the option to waive such defect or terminate the purchase agreement if Emerick was unable to remedy the defect to Wright's satisfaction.

[4] From a list of potential inspectors provided by Jan Ingle, who served as both the listing and selling agent, Wright arranged for Clifton to perform the inspection

---

[1] Cynthia Wright was listed on the purchase agreement as a "buyer" but is not named as a plaintiff in the action now before us.

the day after signing the purchase agreement. There was no written contract between Clifton and Wright and the inspection was performed for the fee of $150.

[5] The house on the property dated to "late 1800, early 1900." Transcript, Volume 2 at 11. There was a crawl space underneath the house which ran from back to front and side to side. At the time Clifton performed the inspection, there was standing water in the crawl space which was observable through a small opening that had been cut in the floor of the home. Clifton prepared a Home Inspection Report, in which he noted the following "minor concerns":

> All sidewalks are in bad shape. Foundation is missing mortar in many joints. Front porch is ok. No access to crawl space at this time (cut in now). Heat ducts are soaked with water. (Builder is replacing and will provide pictures).

Appellant's Appendix, Volume 2 at 23. Under "notes," Clifton added the following:

> Some floor joists have been replaced. No evidence of infestations or evidence of mold or moisture problems.

*Id.* Clifton also stated there were "[n]o major concerns." *Id.*

[6] After receiving Clifton's Home Inspection Report, Wright went through with the purchase of the home. Soon thereafter, the floor began to buckle and the kitchen cabinets pulled loose from the wall. Wright learned that part of the floor was supported by cinder blocks positioned on dirt in the crawl space and

the floor lacked any form of cross-support. In February 2014, Wright secured the services of John Slocum to level the floor by pouring concrete pads in the crawl space and installing cross support beams. Wright paid a total of $4,200 for the repairs.

[7] Over a year later, on May 11, 2015, Clifton recorded the following regarding his memory of the inspection:

> The floor was cut open after I had written that there was no moisure [sic] problems. There was no room to further check under the floor and it still had water under there. The cabinets had just been installed and at that time, they were not coming loose from the wall. I am the one who saw that the ducts were saturated.

*Id.* at 24.

[8] On May 7, 2015, Wright filed a complaint against Clifton and Emerick alleging breach of contract on behalf of both Clifton and Emerick as well as negligence on behalf of Clifton. In August 2017, Wright secured the services of Indoor Comfort Pros to remove and replace the ductwork in the crawl space for $1,784.

[9] Emerick was later dismissed as a defendant and Wright proceeded to a bench trial against Clifton on December 7, 2017. At trial, Ingle, a twenty-five-year veteran of the real estate industry, stated that he accompanied Clifton as he performed the inspection and that Clifton opened the crawl space but could not

enter the crawl space because it was "full of water." Tr., Vol. 2 at 46. Ingle further testified:

> [Question]: So getting back to when you saw you said that there was water underneath the house, would you say that - I mean in your opinion, is that a problem with the house? I mean is that an issue with the house?
>
> [Ingle]: Well, I don't think it's - the whole south end of Portland, when it rains heavy, has water under it. You solve it with a sump pump. Yeah, I would probably put a sump pump under that, if water was getting in there. I would.
>
> [Question]: Do you think that the fact that there was standing water, or mud, or obvious water underneath, is that something that you would think should be listed on a home inspection report?
>
> [Ingle]: I would say, yes. I think he did say something to me about the vents being in the water. And the vents meaning flex duct was in the water. And supposedly raised them and replaced them.
>
> [Question]: In your experience, when you have - when you have homes that have that much moisture standing, does that lead to mold issues?
>
> [Ingle]: It could if they don't get the water out of there.
>
> [Question]: All right.

[Ingle]: Standing water for some time, yeah, will cause mold.

*Id.* at 48-49.

Following the bench trial, the trial court entered findings of fact and conclusions thereon, finding Clifton liable to Wright in the amount of $5,984. Clifton now appeals. Relevant portions of the trial court's judgment will be quoted as necessary.

# Discussion and Decision

## I. Standard of Review

Where the trial court has issued findings of fact and conclusions thereon, we apply a two-tiered standard of review, determining first whether the evidence supports the findings and second whether the findings support the judgment. *Sexton v. Sexton*, 970 N.E.2d 707, 710 (Ind. Ct. App. 2012), *trans. denied*. We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). In order to conclude a finding or judgment is clearly erroneous, our review of the record must leave us "firmly convinced that a mistake has been made." *Sexton,* 970 N.E.2d at 710. We do not defer to the trial court's conclusions of law and will find clear error if the court has applied an incorrect legal standard. *Id*.

# II. Negligence

Wright's underlying action against Clifton is one for negligence. To recover on a theory of negligence, a plaintiff must establish three elements:

> (1) a duty on the part of the defendant to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a failure of the defendant to conform his conduct to the requisite standard of care required by the relationship, and (3) an injury to the plaintiff proximately caused by the breach.

*Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991). Wright alleged Clifton was negligent in his duty to disclose defects in the Home Inspection Report and that by failing to disclose such defects, Wright was deprived of the opportunity to terminate the purchase agreement or request the defects be repaired by Emerick. Clifton argues his relationship with Wright imposed a lower standard of care, the evidence presented at trial was insufficient to establish a breach of his duty of care, and even if there was such a breach, the evidence was insufficient to establish the breach proximately caused the necessary repairs.

## A. Standard of Care

First, Clifton argues that because there was no written, or express, contract between him and Wright, to the "extent that there was a contractual agreement between the parties, it was one without an explicit understanding regarding the scope of the inspection." Brief of Appellant at 8-9. Clifton then contends his $150 fee "suggests that the inspection would not necessarily involve an exhaustive review of every square inch of the property." *Id*. at 9. Although the

recitation of these facts appears to form an argument that Clifton owed a lower standard of care to Wright arising from the nature of their relationship, Clifton fails to develop this argument or provide citation to relevant authority. Accordingly, this argument is waived. *K.S. v. D.S.*, 64 N.E.3d 1209, 1212 (Ind. Ct. App. 2016) (explaining that a party waives any issue for which it fails to develop cogent argument or provide adequate citation to authority).

[14] Waiver notwithstanding, Clifton was retained for the purposes of conducting a home inspection and we have previously explained:

> [A] contract may create a state of things which furnishes the occasion of a tort, so that negligent performance of a contract may give rise to an action in tort. . . . The relation which is essential to the existence of the duty to exercise care may arise through either an express or an implied contract.
>
> As a general rule, there is implied in every contract for work or services a duty to perform it skillfully, carefully, diligently, and in a workmanlike manner, and a negligent failure to observe any of these conditions is a tort, as well as a breach of contract. Thus, a person who contracts to make repairs can be held liable for his negligence in doing the work. And one who contracts in a specialized professional capacity to provide the design for a particular structure may be held to respond in damages for the foreseeable consequences of a failure to exercise reasonable care in the preparation of the design. In such cases, the contract is mere inducement creating the state of things which furnishes the occasion of the tort. In other words, the contract creates the relation out of which grows the duty to use care.
>
> * * *

> The prevailing rule appears to be that where there is a general duty, even though it arises from the relation created by, or from the terms of, a contract, and that duty is violated, either by negligent performance or negligent nonperformance, the breach of the duty may constitute actionable negligence.

*INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d 566, 577-78 (Ind. Ct. App. 2003) (quoting 57A AM. JUR.2d Negligence §§ 119-21), *trans. denied*.

[15] Moreover, unless a contract provides otherwise, it is implied that the parties intend to comply with all applicable statutes and city ordinances in effect at the time of the contract. *See, e.g., Homer v. Burman*, 743 N.E.2d 1144, 1147 (Ind. Ct. App. 2001) (holding that a contractor was bound to abide by the applicable electric code and the Indiana Home Improvement Contracts Act, both of which were in existence when the contract was formed). Here, at the time Clifton contracted to conduct the inspection at issue, Indiana law defined a home inspection as follows:

> "Home inspection" means a visual analysis for the purpose of providing a professional opinion of the condition of a residential dwelling and the dwelling's carports or garages, any reasonably accessible installed components, and the operation of the dwelling's systems, including any controls normally operated by the owner of the dwelling, for the following components:
>
> (1) Heating systems.
> (2) Cooling systems.
> (3) Electrical systems.
> (4) Plumbing systems.
> (5) Structural components.
> (6) Foundations.

(7) Roof coverings.

(8) Exterior and interior components.

(9) Any other site aspects that affect the residential dwelling.

Ind. Code § 25-20.2-2-6 (2003). Although this statute was amended, effective July 1, 2014, to specifically add "[a]ttic spaces" and "[b]asement or crawl space, if any," to its list of components, we have no doubt these components fell within the broad language of the statute in effect at the time of Clifton's contract with Wright. *Id.* Thus, in agreeing to conduct the home inspection for Wright, regardless of the existence of an express contract or the price thereof, Clifton agreed to perform the service "skillfully, carefully, diligently, and in a workmanlike manner," *INS Investigations Bureau, Inc.*, 784 N.E.2d at 577, and to comply with all relevant statutes, *Homer*, 743 N.E.2d at 1147.

[16] With that duty in mind, we proceed to the merits of Clifton's properly presented arguments regarding breach and proximate cause.

## B. Breach of Duty[2]

[17] Clifton argues there is insufficient evidence to establish that he breached a duty of care. The trial court found:

---

[2] We note that Wright did not make any argument regarding negligence per se to the trial court or to this court on appeal. Under the doctrine of negligence per se, the unexcused violation of a statute or ordinance constitutes negligence per se if the provision (1) "protect[s] the class of persons in which the plaintiff is included" and (2) "protect[s] against the type of harm which has occurred as a result of the violation." *City of Fort Wayne v. Parrish*, 32 N.E.3d 275, 277 (Ind. Ct. App. 2015), *trans. denied*. Indiana Code section 25-20.2-5-1 provides, "Unless exempt under this article, a person may not conduct a home inspection for compensation without first obtaining a license as a home inspector." Clifton admitted at trial, Tr., Vol. 2 at 61, and

12.    . . . The really key testimony was from the Realtor, Jan Ingle. Ingle did not place the blame on anyone. But he gave the critical observation: there was enough water under the house, in the crawl space, that it was too muddy for someone to go under and look. Having that much water under the house and leaving it there is a major problem. It would not have been a problem if someone put a sump pump under the house and removed the water.

This testimony leads me to conclude that Clifton was negligent in inspecting the house. That much water and mud under the house signaled a problem in and of itself. A reasonably careful inspector would have done one of two things: pump the water out to see what exactly was going on under the house; or advise Wright that he, Clifton, could not do a thorough inspection under the house due to the water, and advise Wright that the water may be hiding other conditions.

Appellant's App., Vol. 2 at 10-11.

[18]    Pursuant to Clifton's implied duty of care, conducting a proper home inspection required Clifton to enter the home's crawl space. Clifton argues that his Home Inspection Report "indicated that he had no access to the crawl space at that time[,]" Br. of Appellant at 9, and that Wright was therefore aware of the fact that he could not, and did not, conduct a full inspection beneath the home. We

---

concedes on appeal, Br. of Appellant at 6 n.3, that he has no such license. However, as this issue was not raised by Wright at trial or on appeal, this issue is waived. *See K.S.*, 64 N.E.3d at 1212; *cf. Mid–States Gen. & Mech. Contracting Corp. v. Town of Goodland*, 811 N.E.2d 425, 436 (Ind. Ct. App. 2004) (explaining that "[a]n appellant who presents an issue for the first time on appeal waives the issue for purposes of appellate review").

find this fact of little significance. Despite the obvious presence of standing water in the crawl space, Clifton did not indicate that in the Home Inspection Report, except to note the "[h]eat ducts are soaked with water. (Builder is replacing and will provide pictures)." Appellant's App., Vol. 2 at 23. The evidence reveals that part of the floor of the home was supported by cinder blocks and lacked any form of cross-support. This was easily discoverable had Clifton entered the crawl space. Furthermore, the report stated there was "[n]o evidence of infestations or evidence of mold or moisture problems." Appellant's App., Vol. 2 at 23. But, as Ingle later testified at trial, standing water "will cause mold." Tr., Vol. 2 at 49. All of these defects were erroneously omitted from the Home Inspection Report and we believe a reasonable home inspector would have observed, and properly noted, all of these defects.

[19] As the trial court concluded, however, at a bare minimum, Clifton should have advised Wright that he "could not do a thorough inspection under the house due to the water, and . . . that the water may be hiding other conditions." Appellant's App., Vol. 2 at 10-11, ¶ 12. Clifton failed to provide such warning and his Home Inspection Report states unequivocally there were "[n]o major concerns" and "[n]o evidence of infestation or evidence of mold or moisture problems." *Id.* at 23. Therefore, as we are not "firmly convinced that a mistake has been made[,]" *Sexton,* 970 N.E.2d at 710, we must affirm the trial court.

# C. Proximate Cause

[20] Next, Clifton argues that even if he did breach his duty of care, the evidence was insufficient to establish the breach proximately caused the necessary repairs. Again, we disagree.

[21] "A negligent act or omission is the proximate cause of an injury if the injury is a natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated." *City of Portage v. Lindbloom*, 655 N.E.2d 84, 86 (Ind. Ct. App. 1995), *trans. denied*. Here, the trial court concluded:

> 13. Clifton's failure to do a reasonable inspection and/or to advise Wright as to possible issues under the house, in the crawl space, led Wright to purchase the house without requiring additional inspection or repairs.
>
> 14. Wright should recover the $4,200.00 expense paid to John Slocum to repair the issues in the crawl space.
>
> 15. Wright should recover the $1,784.00 expense paid to Indoor Comfort Pros to remove and replace the flex ductwork in the crawl space.

Appellant's App., Vol. 2 at 11.

[22] Clifton contends his inspection was not the proximate cause of the $1,784 paid to Indoor Comfort Pros to remove and replace the ductwork in the crawl space because Clifton had provided Wright "with written notice of the water that had accumulated in the crawl space," and that Garrett Paige "was responsible, on

behalf of the seller, with replacing the duct work [sic]." Br. of Appellant at 10. On appeal, Wright fails to respond to this argument and we view an appellee's failure to respond to an issue raised in an appellant's brief as akin to failing to file a brief as to that issue. *Nance v. Miami Sand & Gravel*, LLC, 825 N.E.2d 826, 837 (Ind. Ct. App. 2005), *trans. denied*. "Although this failure does not relieve us of our obligation to correctly apply the law to the facts in the record in order to determine whether reversal is required, counsel for the appellee remains responsible for controverting arguments raised by the appellant." *Id*. For us to reverse the judgment of the trial court, Clifton must establish only that the trial court committed prima facie error. *See id*. "'Prima facie means at first sight, on first appearance, or on the face of it.'" *Id*.

[23]   The Home Inspection Report provided the "[h]eat ducts are soaked with water. (Builder is replacing and will provide pictures)." Appellant's App., Vol. 2 at 23. At trial, Wright acknowledged that the "builder" referred to in the report was Garrett Paige, whom Wright described as the "gentleman that Mr. Emerick [used] to do the work on the house" prior to listing it, Tr., Vol. 2 at 39, and Clifton testified that Paige was present for the inspection and stated that he would replace the heat ducts and provide pictures. Clifton also testified that he offered to return to the home and ensure that the heat ducts had been replaced. Wright, however, refuted Clifton's testimony:

> [Question]:   Did [Clifton] ask you if he should come back?
>
> [Wright]:   No, he did not offer to come back. And it was under my assumption, since he was the one who

had written up the inspection, that he was the one who was going to be told whether the ductwork was replaced or not. There's nothing on the inspection report that says it was going to come to me. I wasn't the one that was going on the inspection. So if it was the inspector that was inspecting it, and was going to verify that the work was done, I was assuming that the inspector then would be the one that [Paige] would contact.

[Question]: All right. And then after this date - after the day of the inspection, you never heard from Mr. Clifton again?

[Wright]: That is correct.

*Id.* at 76.

[24] The trial court determined the disputed testimony was irrelevant and concluded that regardless of any agreement with Paige, Clifton should have inspected the crawl space or advised Wright that he "could not do a thorough inspection under the house due to the water, and . . . that the water may be hiding other conditions." Appellant's App., Vol. 2 at 10-11. In light of the evidence presented at trial and Clifton's rather perfunctory arguments[3] on appeal, we are not convinced the trial court committed prima facie error.

---

[3] For instance, Clifton asserts, without further explanation, that "the replacement of the duct work in the crawl space was done in 2017, some 4 years after the inspection by Clifton." Br. of Appellant at 10.

Finally, Clifton argues the evidence failed to establish a "nexus between any alleged failure in Clifton's inspection with the work that was done on the flooring." Br. of Appellant at 10. To the contrary, the evidence presented at trial revealed a large section of the home's flooring lacked any form of cross support and was supported only by concrete cinderblocks. Had Clifton conducted the inspection of the crawl space "skillfully, carefully, diligently, and in a workmanlike manner," *INS Investigations Bureau, Inc.*, 784 N.E.2d at 577, he would have easily noticed that fact. At a bare minimum, Clifton should have provided Wright a warning that the standing water in the crawl space may be concealing hidden conditions.

We conclude, as did the trial court, that the repairs later sought by Wright were the "natural and probable consequence" of Clifton's negligent Home Inspection Report, which, "in light of the circumstances, should reasonably have been foreseen or anticipated." *City of Portage*, 655 N.E.2d at 86. As we remain unconvinced the trial court committed clear error in its judgment, we must affirm the judgment of the trial court. *Sexton,* 970 N.E.2d at 710.

# Conclusion

For the reasons set forth above, we conclude the evidence supports the trial court's findings and the findings support the trial court's judgment. Therefore, we affirm.

Affirmed.

Baker, J., and May, J., concur.