

FILED

Feb 07 2017, 10:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Gregory M. Feary
Braden K. Core
Christopher J. Eckhart
E. Ashley Paynter
Scopelitis Garvin Light Hanson
  & Feary, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Irwin B. Levin
Richard E. Shevitz
Vess A. Miller
Lynn A. Toops
Cohen & Malad, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Celadon Trucking Services, Inc.,

*Appellant-Defendant,*

v.

Charles Wilmoth and Kent Vassey, on behalf of themselves and all others similarly situated,

*Appellees-Plaintiffs.*

February 7, 2017

Court of Appeals Case No. 49A04-1512-PL-2104

Appeal from the Marion Superior Court

The Honorable Michael D. Keele, Judge

Trial Court Cause No. 49D07-1310-PL-36806

**Barnes, Judge.**

# Case Summary

Celadon Trucking Services, Inc. ("Celadon") appeals the trial court's judgment in favor of Charles Wilmoth, Kent Vassey, and a class of similarly-situated individuals ("the Class") in the amount of $3,302,923.60 plus pre- and post-judgment interest. We affirm.

# Issues

The restated issues before us are:

I.      whether the trial court properly denied Celadon's motion for judgment on the pleadings; and

II.      whether the trial court properly granted summary judgment in favor of the Class members on their claim that Celadon overcharged them for fuel purchases they made using a Celadon-issued debit card.

# Facts

Celadon is a nationwide transportation company headquartered in Indianapolis that provides trucking services to its customers. Celadon both directly employs company drivers, who drive company-owned trucks, and independent contractors, who drive their own trucks. The Class members are independent contractor-truck owners-drivers. Employee drivers are not responsible for expenses, such as fuel, incurred during the course of employment and must refuel at locations Celadon designates. Independent contractors, such as the

Class members, are responsible for such expenses, including fuel costs, but are paid significantly more per mile than employee drivers.[1]

[4] To pay for fuel while on a job, employee drivers were given a "Comdata" card, which functions like a consumer credit or debit card. App. p. 33. Additionally, Celadon required its employee drivers to refuel at Pilot Flying J truck stops whenever possible, in return for Pilot Flying J offering a substantial fuel cost discount to Celadon. Whenever a Comdata card was swiped at a Pilot Flying J fuel pump, the displayed price per gallon automatically would be reduced from the posted "credit" price to the "cash" price, which typically is about six cents per gallon less than the "credit" price. However, Celadon actually paid Pilot Flying J less than the displayed "cash" price for transactions using the Comdata card. The discounted price Pilot Flying J charged Celadon generally was equivalent to Pilot Flying J's cost minus eight cents per gallon.[2] Pilot Flying J would send separate invoices to Celadon for fuel purchases made using Comdata cards, which Celadon then paid at the discounted price.

[5] Celadon also provided Comdata cards to its independent contractors. When an independent contractor would use a Comdata card at a Pilot Flying J, as with employee drivers, the displayed price per gallon was reduced from the "credit" to the "cash" price. Celadon then would deduct the amount of Comdata fuel

---

[1] Wilmoth and Vassey stated that Celadon paid independent contractors ninety cents per mile, versus thirty to thirty-four cents per mile to employees.

[2] There was a greater discount for fuel purchased at a limited number of Pilot Flying J locations.

purchases from an independent contractor's total compensation before paying them, using a calculation based on the fuel's "cash" pump price. This amount also was reflected on fuel receipts from Pilot Flying J to the drivers.[3] However, as with employees, Celadon actually paid Pilot Flying J much less than the "cash" price for these Comdata purchases. Celadon paid Pilot Flying J the same discounted cost-less-eight-cents per gallon, and Celadon retained the difference when deducting the higher pump price from an independent contractor's compensation. Additionally, independent contractors could choose to use the Comdata card at locations other than Pilot Flying J, though Celadon imposed a higher fee for doing so— $7.50 versus $3.00 per transaction—thus making it financially more attractive for the drivers to refuel at Pilot Flying Js.

[6] The standard contract between Celadon and the Class members contained the following provision regarding compensation:

> **5.05 Charges to Contractor.** Contractor agrees that Contractor's compensation for services hereunder may be withheld by Carrier [Celadon] for payment of, and Carrier may set off against Contractor's compensation for:
>
> a)      All charges and deductions authorized by Contractor under this Agreement including, but not limited to, charges, deductions and liabilities referred to in the following sections hereof:  2.04, 3.02, 3.03, 4.01, 4.02, 4.04, 5.03, 6.02, 8.01, 8.02,

---

[3] Celadon's compensation to the independent contractors also sometimes included "fuel surcharges."  The precise nature of these "surcharges" or what they were intended to compensate for is unclear from the record.

8.03, 8.05, 8.06, 9.01, 9.03, 9.04, 10.01, 10.04 and 12.01;[4] or in the Schedule of Compensation, or the option insurance program.

b)     Any other charges or expenses incurred or paid by Carrier on behalf of Contractor.

c)     Advances and other extensions of credit by Carrier to Contractor. . . .

*Id.* at 44. Section 9.02(c) of the contract stated that the contractors had "sole and complete responsibility for . . . [p]aying all operating costs and expenses incidental to the operation of the Equipment including, but not limited to fuel . . . ." *Id.* at 46. Finally, a "Contractor Miscellaneous Fees Addendum" provided in part:

1.     Celadon will continue to advance monies to the Contractor from time to time as requested by the Contractor and approved by Celadon. However the fee charges to the Contractor provided by Celadon for providing this service to the Contractor shall be as follows:

A.     $3.00 per advance if the Contractor purchases fuel at a Celadon designated fuel location.

B.     $7.50 per advance if the Contractor does not purchase fuel at a Celadon designated location at the time the advance is requested and paid.

---

[4] None of these sections of the contract refer to fuel charges.

*Id.* at 59.  Comdata cards and their use were not explicitly governed or mentioned anywhere in the standard independent contractor trucking contracts.

[7]     Wilmoth and Vassey signed their contracts with Celadon after speaking with a Celadon representative, Phil Harris.  Before signing the contracts, Harris told Wilmoth and Vassey that they would get the same discounts Celadon enjoyed on fuel purchases.  Wilmoth and Vassey later discovered that, in fact, Celadon received a greater discount on fuel purchases at Pilot Flying Js than Celadon was reflecting in their compensation.

[8]     On October 1, 2013, Wilmoth and Vassey filed a complaint against Celadon and requested that it be certified as a class action lawsuit.  The complaint sought to recover the difference between the amount Celadon deducted from independent contractors' compensation for fuel charges at Pilot Flying J's and the lower amount Celadon actually paid Pilot Flying J for that fuel.  The complaint had two counts:  one for breach of contract, and a second for unjust enrichment.  Celadon filed an answer that contained individual counterclaims against Wilmoth and Vassey for alleged breaches of contract unrelated to the fuel purchasing issue, as well as a counterclaim request for attorney fees. Celadon moved for judgment on the pleadings against Wilmoth and Vassey's claims, based on the content of the pleadings and the language of the standard contract at issue.  The trial court denied this motion.  It subsequently granted Wilmoth and Vassey's request for class certification, defining the class as any person or entity who entered into an independent contractor agreement with Celadon between October 1, 2013, and January 31, 2014, and "whose

compensation was withheld or charged back in some amount by Celadon for diesel fuel purchased at a Pilot Flying J truck stop with a Comdata card issued by Celadon." *Id.* at 212. The trial court noted that, based on discovery responses, the Class may contain up to 2,495 members.

[9] In October 2014, the parties filed cross-motions for summary judgment. The Class sought summary judgment in its favor on its breach of contract claim and against all of Celadon's counterclaims. Celadon sought summary judgment against both the breach of contract and unjust enrichment counts of the Class's complaint. In one order, the trial court granted summary judgment in the Class's favor on all of Celadon's counterclaims; Celadon does not challenge that ruling. In a separate order, the trial court granted summary judgment in the Class's favor on its breach of contract claim and denied Celadon's summary judgment motion as to both claims of the complaint. The trial court found that the Class's damages totaled $3,805,836 and that it was entitled to pre-judgment interest as well. The trial court subsequently entered a Trial Rule 54(B) final judgment order, but reduced the principal judgment amount to $3,302,923.60, plus pre- and post-judgment interest. Celadon now appeals.

## Analysis

[10] On appeal, Celadon challenges both the denial of its motion for judgment on the pleadings and the granting of summary judgment in favor of the Class. We first note general principles of contract interpretation applicable to both motions. "The goal of contract interpretation is to determine the intent of the parties when they made the agreement." *Tender Loving Care Mgmt., Inc. v. Sherls*,

14 N.E.3d 67, 72 (Ind. Ct. App. 2014). This court must examine the plain language of the contract, read it in context and, whenever possible, construe it so as to render every word, phrase, and term meaningful, unambiguous, and harmonious with the whole. *Id.* Construction of the terms of a written contract generally is a pure question of law. *Id.* If, however, a contract is ambiguous, the parties may introduce extrinsic evidence of its meaning, and the interpretation becomes a question of fact. *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016), *trans. denied*. "A word or phrase is ambiguous if reasonable people could differ as to its meaning." *Id.* A term is not ambiguous solely because the parties disagree about its meaning. *Id.*

[11] If contract language is unambiguous, this court may not look to extrinsic evidence to expand, vary, or explain the instrument but must determine the parties' intent from the four corners of the instrument. *Tender Loving Care Mgmt.*, 14 N.E.3d at 72. If the language is deemed ambiguous, the contract terms must be construed to determine and give effect to the intent of the parties when they entered into the contract. *Id.* "Courts may properly consider all relevant evidence to resolve an ambiguity." *Id.* "'Extrinsic evidence is evidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement.'" *Id.* (quoting *CWE Concrete Const., Inc. v. First Nat'l Bank*, 814 N.E.2d 720, 724 (Ind. Ct. App. 2004), *trans. denied*). An ambiguous contract should be construed against the party who furnished and drafted the agreement. *Id.*

# I. Judgment on the Pleadings

The standard of review for a ruling on a motion for judgment on the pleadings under Indiana Trial Rule 12(C) is de novo. *Consolidated Ins. Co. v. National Water Servs., LLC*, 994 N.E.2d 1192, 1196 (Ind. Ct. App. 2013), *trans. denied*. A ruling on a Rule 12(C) motion must be based solely on the pleadings, as well as any facts of which judicial notice may be taken, and courts must accept the properly-pleaded material facts alleged in the complaint as true. *Id.* A motion for judgment on the pleadings may be granted only if it is clear from the face of the complaint that relief could not be granted to the plaintiff under any circumstances. *Id.*

For purposes of a Rule 12(C) motion, the pleadings consist of the complaint and answer, as well as any reply to a counterclaim, answer to a cross-claim, third-party complaint, and answer to a third-party complaint. *Id.* "'Pleadings' also consist of any written instrument attached to a pleading, pursuant to Ind. Trial Rule 9.2." *Id.* "A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Ind. Trial Rule 10(C).

Here, because the Class's action against Celadon was based at least in part upon the terms of a written instrument—the standard contract between Celadon and its independent contractor-truckers—the Class was required to attach a copy of that contract to the complaint. *See Eskew v. Cornett*, 744 N.E.2d 954, 957 (Ind. Ct. App. 2001) (citing Ind. T.R. 9.2(A)), *trans. denied*. We may look to both the complaint and the attached contract for purposes of reviewing the trial court's ruling on the motion for judgment on the pleadings. *Id.* "However, where

allegations of a pleading are inconsistent with terms of a written contract attached as an exhibit, the terms of the contract, fairly construed, must prevail over an averment differing therefrom." *Id.* Also, a party moving for judgment on the pleadings concedes only the accuracy of the factual allegations in an adversary's pleadings and does not admit assertions that constitute conclusions of law. *Id.*

[15] For purposes of a motion for judgment on the pleadings, it would appear Celadon could only have been entitled to such a judgment if the contract at issue is deemed unambiguous and its terms support Celadon's position. That is, if the contract were deemed ambiguous, the parties would or should have been afforded the opportunity to present extrinsic evidence regarding the contract's interpretation. But, if the contract is unambiguous, it would be a pure question of law as to its interpretation. We would look only to the four corners of the instrument, and it would be an appropriate matter to resolve on a motion for judgment on the pleadings.

[16] Celadon contends that the contract unambiguously provided that money deducted from an independent contractor's pay for use of the Comdata card was an "advance," for which Celadon only was required to reflect the at-the-pump price at the time the purchase was made when making a deduction for fuel purchase from an independent contractor's compensation, not the lesser amount paid to Pilot Flying J. By contrast, the Class asserts the accurate measure of such deductions under the contract was the amount Celadon actually paid to Pilot Flying J for the fuel purchases, not the at-the-pump price.

[17] Before turning to our analysis, we note that both parties on appeal rely on parts of the contract that they did not explicitly rely on in proceedings before the trial court. Specifically, Celadon now refers to the Section 9.02(c) of the contract and the contract "Addendum," while the Class refers to Section 5.05(b) of the contract. It is true that, "'A party generally waives appellate review of an issue or argument unless that party presented that issue or argument before the trial court.'" *L.H. Controls Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1042 (Ind. Ct. App. 2012) (quoting *Dedelow v. Pucalik*, 801 N.E.2d 178, 183 (Ind. Ct. App. 2003)). However, "[t]he appellate waiver rule for failing to make arguments to the trial court does not preclude a party from expanding upon arguments made to the trial court and presenting additional authorities to the appellate court . . . ." *Id.* at 1042-43. The waiver rule does not mean that parties may not take any new position or that no new arguments may be adduced; it only means that independent substantive questions not within the issues or not presented to the trial court cannot be made for the first time on appeal. *Dedelow*, 801 N.E.2d at 183-84 (quoting *Bielat v. Folta*, 141 Ind. App. 452, 454, 229 N.E.2d 474, 475 (1967)).

[18] We believe that the parties' "new" arguments on appeal invoking different contractual provisions than they did before the trial court are merely expansions upon their earlier arguments. Additionally, this court is reviewing the interpretation of a contract and the denial of a motion for judgment on the pleadings and a granting of summary judgment, which are questions of law to be reviewed de novo. Also, general rules of contract interpretation require us to

consider the contract as whole. We are not limited in that interpretation to the precise arguments made by the parties before the trial court and need not turn a blind eye to contractual provisions that may be relevant to our analysis.

[19] We conclude that the contract is ambiguous with respect to how much Celadon was permitted to deduct from a trucker's compensation for fuel purchases at Pilot Flying Js made using a Comdata card. Celadon contends that the contract expressly defines the use of a Comdata card by an independent contractor as an "advance" on compensation. It also claims that as an "advance," Section 5.05(c) of the contract unambiguously permits Celadon to deduct the pump price for fuel from a contractor's compensation, not discounted price. However, there is no express definition section in the contract, for the word "advance" or anything else. Indeed, Comdata cards and their use are mentioned nowhere in the contract.

[20] Additionally, although Section 9.02(c) of the contract requires truckers to pay fuel "costs and expenses" for their jobs, there is no explanation of how to calculate the proper amount for fuel costs. App. p. 46. That is, the contract does not equate fuel "costs and expenses" with either the actual costs paid by Celadon or the pump price displayed to truckers at Pilot Flying Js. Such absence of information or explanation in the contract might not have been noticeable if there was in fact no difference between the pump price for fuel at Pilot Flying Js and what Celadon actually paid for those fuel purchases. But there was such a difference, and the contract is entirely silent on how to address that difference. After January 31, 2014, Celadon did in fact change its contract

to clearly allow it to deduct the pump price from a contractor's compensation, as conceded by the Class. Before that date, the contract was ambiguous. Because the contract is ambiguous, the trial court properly denied Celadon's motion for judgment on the pleadings.

## II. *Summary Judgment*

When reviewing a grant of summary judgment, we must draw all reasonable inferences in favor of the non-moving party and affirm only "'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016) (quoting Ind. Trial Rule 56(C)). Careful scrutiny must be given to a grant of summary judgment to ensure that the losing party was not improperly denied its day in court. *Id.* "Indiana's distinctive summary judgment standard imposes a heavy factual burden on the movant to demonstrate the absence of any genuine issue of material fact on at least one element of the claim." *Id.*

Cases involving contract interpretation generally are particularly appropriate for summary judgment. *Rusnak v. Brent Wagner Architects*, 55 N.E.3d 834, 840 (Ind. Ct. App. 2016), *trans. denied*. "When the terms of a contract are ambiguous or uncertain, however, and its interpretation requires extrinsic evidence, its construction is left to the factfinder." *Id.* "When summary judgment is granted based on the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain,

or that any contract ambiguity can be resolved without the aid of a factual determination." *Id.* at 840-41.

[23] In attempting to interpret this ambiguous contract, we may consult sources reflecting the ordinary meaning of its terms at the time the contract was executed. *See Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008). The key disputed term at issue here is the word "advance." Black's Law Dictionary defines "advance" as "1. The furnishing of money or goods before any consideration is received in return. 2. The money or goods furnished." BLACK'S LAW DICTIONARY 63 (10th ed. 2009). Here, the undisputed designated summary judgment evidence was that, when a Comdata card was used at a Pilot Flying J for a fuel purchase, Celadon did not immediately transfer any money to either the trucker or Pilot Flying J for that purchase. Instead, Pilot Flying J subsequently sent an invoice to Celadon reflecting the amount of fuel purchased at the agreed-to discount of cost minus eight cents per gallon, and Celadon paid that amount. Thus, Celadon never parted with the cash pump price as opposed to the lesser discount price and cannot be said to have ever "advanced" or "furnished" a fuel purchase at the pump price. Keeping in mind that we must construe this ambiguous contract against Celadon as its drafter, we conclude that it is more accurate to state that what Celadon "advanced" to truckers when they used a Comdata card at Pilot Flying J was the actual fuel itself—not the specific pump price of the fuel. The standard definition of an advance is that it may apply to either "money or goods." Celadon never advanced any money to anyone—it only advanced or

facilitated the advance of goods. The cost of those goods to Celadon was not the pump price but the discounted price.

[24] We acknowledge Celadon's argument that, if a trucker attempted to drive away from a Pilot Flying J pump after filling up but without paying, the trucker could have been charged with theft under Indiana Code Section 35-43-4-2; the trucker's use of a Comdata card avoids that predicament. However, if indeed such an event occurred and a prosecution was brought and Pilot Flying J sought restitution, Pilot Flying J would not have been entitled to recover the full pump price from the absconding trucker. In fact, if a Celadon trucker did pay Pilot Flying J only the discounted price but not the displayed pump price, it is unclear that there would be any theft at all. This court has held that, "retail value is not necessarily the appropriate measure of damages" in every case of theft by a consumer from a retailer. *T.C. v. State*, 839 N.E.2d 1222, 1228 (Ind. Ct. App. 2005). It would appear full retail value would not be appropriate as restitution in a case such as this, as opposed to using the discounted Celadon price. Otherwise, Pilot Flying J would enjoy a windfall based on the fact that the trucker stole the fuel rather than paid for it with a Comdata card. The discounted price was all that Pilot Flying J was ever entitled to recover for purchases made by Celadon independent contractors using a Comdata card, and that would be the appropriate value to use for restitution purposes.

[25] Celadon also argues that, if the measure of an "advance" under Section 5.05(c) of the contract is the actual cost to Celadon and not the pump price displayed to the truckers, it is rendered superfluous to Section 5.05(b) of the contract and its

reference to "[a]ny other charges or expenses incurred or paid by Carrier on behalf of Contractor." App. at 44. Celadon seems to concede that Section 5.05(b) would clearly refer to Celadon's actual costs and not some other amount and that it could only deduct its actual costs under that subsection from an independent contractor's compensation if a particular item fell under it. It contends that fuel costs fall strictly under Section 5.05(c) and that they should be measured by the pump price, not the discounted actual cost to Celadon, in order to differentiate that section from Section 5.05(b).

[26] Celadon's proposed interpretation is inconsistent with a holistic reading of the contract, particularly when construing it against Celadon as its drafter. With respect to Section 5.05 of the contract, the Class states, "Taken as a whole this section permits Celadon to seek reimbursement for costs; however it does not permit Celadon to seek reimbursement for more than Celadon's costs." Appellee's Br. p. 18. We agree with that characterization. Additionally, Section 9.02(c) of the contract states that the contractors had "sole and complete responsibility for . . . [p]aying all operating *costs and expenses* incidental to the operation of the Equipment including, but not limited to fuel . . . ." App. at 46 (emphasis added). The use of the phrase "costs and expenses" would indicate the actual cost of such fuel, not a displayed pump price that was never actually paid by anyone. Finally, we note that in the contract's "Addendum," it provides for certain fees to be imposed upon any "advance" from Celadon to a trucker related to fuel purchases. *Id.* at 59. Although Celadon was able to be

quite specific with respect to these fees, it included no language with respect to how to calculate an "advance."

[27] Celadon also contends there could be outstanding genuine issues of material fact regarding interpretation of the contract, based on the individual understandings of the nearly 2,500 truckers who signed it and who form the Class members. Celadon implies that different drivers could have had different understandings of the type of fuel discount they would receive when they signed their contracts, and if there were such differing understandings, there could not be a uniform definition of the word "advance" or even a class action, for that matter. However, Celadon has not presented any evidence that any trucker had an understanding different from that advanced by the Class. Indeed, the only evidence in the record on that point comes from the depositions of Wilmoth and Vassey, who explained their understanding that they would receive fuel discounts identical to any Celadon received. Celadon is at best speculating that different drivers could have had different understandings about the contract. Mere speculation cannot create questions of fact for purposes of a summary judgment motion. *Beatty v. LaFountaine*, 896 N.E.2d 16, 20 (Ind. Ct. App. 2008), *trans. denied*. In any event, interpretation of the contract is readily possible from the face of it and the extrinsic evidence besides Wilmoth's and Vassey's depositions; there is no need to resort to deposing thousands of other Class members in order to interpret it.

Celadon asserts that the Class members are improperly seeking to be third-party beneficiaries of the contract between Celadon and Pilot Flying J. To enforce a contract as a third-party beneficiary, the third party must show:

> (1) A clear intent by the actual parties to the contract to benefit the third party;

> (2) A duty imposed on one of the contracting parties in favor of the third party; and

> (3) Performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract.

*Eckman v. Green*, 869 N.E.2d 493, 496 (Ind. Ct. App. 2007) (quoting *Lunhow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001)), *trans. denied*. We do not believe that third-party beneficiary principles are relevant here. The question is not whether the Class members are attempting to enforce the contract between Celadon and Pilot Flying J. This is not a case, for example, where Pilot Flying J charged Celadon more than the agreed-to discounted price for fuel and the Class members are attempting to force Pilot Flying J to charge only the discounted price. Rather, the sole question is what Celadon's actual costs were with respect to fuel purchased by the Class members at Pilot Flying Js. The fact that those costs resulted from a contract between Celadon and Pilot Flying J is beside the point here.

[29] After briefing was complete, Celadon filed a notice of additional authority, citing a case decided by the Seventh Circuit, *Walker v. Trailer Transit, Inc.*, 824

F.3d 688 (7th Cir. 2016). That case, like this one, concerned a contract between a trucking company and independent contractors it hired. Similar, but not precisely identical to the present case, it also concerned contract language regarding payment to the contractors and deductions from their compensation for payments made by the company on behalf of the contractors during their work for "special services," and whether the company was permitted to retain an additional profit on those deductions because of the manner in which the services were billed and paid.

[30] We are not inclined to find that *Walker* has any application to this case. First and most importantly, the contract language here is vastly different from that in *Walker*. Contracts must be analyzed strictly on their own terms. Second, although purporting to apply Indiana law, the *Walker* opinion is devoid of any mention of well-settled contract interpretation principles under Indiana law. One of those principles is that any ambiguity in a contract should be construed against the drafter of the contract. The Seventh Circuit seemed to acknowledge that there could be some ambiguity in the key word "reimburse" but construed it in a manner favorable to the contract drafter. *See Walker*, 824 F.3d at 689-90.

[31] On a final note, we believe our and the Class's interpretation of the contract is consistent with the common expectation consumers have when using a credit or debit card to purchase goods. Namely, when such a card is used, the consumer reasonably expects that the card issuer will pay the retailer the displayed retail price for the good or goods, not some undisclosed price based on a "secret" agreement between the issuer and retailer. A possible exception to this

expectation may be the recouping costs or charges to the retailer associated with credit card usage. The Class members here reasonably could have expected that, when they used the Comdata card to purchase fuel, Celadon was paying the displayed pump price to Pilot Flying J and not some lesser amount, in the absence of any clear statement to the contrary in the contract. In sum, we agree with the Class and the trial court that the proper interpretation of the contract, construing its ambiguities against Celadon as its drafter, is that when making deductions from a trucker's compensation for fuel purchases made at Pilot Flying Js using a Comdata card, Celadon could only make those deductions based on the lower discounted price and not the displayed pump price.

## Conclusion

[32] The standard contract between Celadon and the Class members was ambiguous. There are no genuine issues of material fact precluding us from resolving that ambiguity as a matter of law. We agree with the trial court and the Class's interpretation of the contract and, therefore, affirm the denial of Celadon's motion for judgment on the pleadings and affirm the grant of summary judgment in favor of the Class.

[33] Affirmed.

Riley, J., and Bailey, J., concur.