FILED

Jun 06 2019, 6:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANTS

James R. Fisher
Debra H. Miller
Miller & Fisher, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Indy Racing League, LLC d/b/a
Indycar

Angela P. Krahulik
Jenny R. Buchheit
Ice Miller, LLP
Indianapolis, Indiana

Rahal Letterman Lanigan Racing,
LLC

Robert D. MacGill
Alexander P. Orlowski
Barnes & Thornburg, LLP
Indianapolis, Indiana

Document and Packaging Brokers,
Inc. d/b/a Docupak

Laura S. Reed
Sarah M. Marr
Riley Bennett Egloff, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Panther Brands, LLC and Panther Racing, LLC, <br><br> *Appellants-Plaintiffs/Counter-Defendants,* <br><br> v. <br><br> Indy Racing League, LLC d/b/a Indycar, Rahal Letterman | June 6, 2019 <br><br> Court of Appeals Case No. 18A-CT-2705 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Heather A. Welch, Judge |

| | |
|---|---|
| Lanigan Racing, LLC and Document and Packaging Brokers, Inc. d/b/a Docupak,<br><br>*Appellees-Defendants/ Counter-Plaintiffs.* | Trial Court Cause No. 49D01-1402-CT-4557 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellants-Plaintiffs, Panther Brands, LLC and Panther Racing, LLC (collectively, Panther[1]), appeal the trial court's summary judgment in favor of Appellees-Defendants, Indy Racing League LLC d/b/a Indycar (Indycar); Rahal Letterman Lanigan Racing LLC (RLL); and Document and Packing Brokers, Inc. d/b/a Docupak (Docupak) (Collectively, Defendants), finding no genuine issue of material fact that Section 9.15 of the 2013 contract entered into between Panther Brands and Indycar did not prohibit Indycar from providing RLL with access to Fan Village space in 2014 and, therefore, Defendants were entitled to judgment as a matter of law.

---

[1] Although Panther Racing and Panther Brands are separate entities, Appellants' First Amended Complaint referred to both entities generically as Panther and asserted claims on behalf of Panther. The parties' summary judgment motions and the trial court's Order also generally referred to both entities as Panther. Accordingly, this opinion will generally refer to the Appellants as Panther, unless a difference between the entities is relevant to this appeal.

We affirm.

## ISSUES

Panther raises three issues on appeal, which we restate as follows:

(1) Whether the trial court erred in concluding, as a matter of law, that the contract between Panther Brands and Indycar did not prohibit Indycar from providing RLL access to the Fan Village in 2014 for the benefit of the Army National Guard (ARNG);

(2) Whether the trial court erred in granting summary judgment in favor of Defendants on Panther's claim of bid-rigging; and

(3) Whether the trial court erred in narrowly construing the tort of unfair competition and refusing to extend the tort to include claims for the perceived misuse of confidential information.

## FACTS AND PROCEDURAL HISTORY

Panther Racing was an Indycar race team, competing in the Indycar series until 2014.[2] Panther Brands operated as the marketing and brand management arm of Panther Racing. Both Panther Racing and Panther Brands were subsidiaries of CAT Holdings. At all times during these proceedings, Panther was an Indiana entity with its principal place of business in Indianapolis, Indiana.

---

[2] Although Panther ceased operations in 2014, the companies have not been dissolved.

[5] Indycar is the sanctioning body for the Indycar Series, with Mark Miles (Miles) as its CEO. It is an Indiana company, with its principal place of business in Speedway, Indiana. RLL is an Indycar race team which served as its own marketing services and brand management company. It was a competitor to Panther and is located in Brownsburg, Indiana.

[6] Between 2008 and 2013, Panther's main sponsor was the ARNG. The ARNG did not enter into direct sponsorship contracts with race teams; rather, to sponsor an Indycar race team in any given season, the ARNG would contract with Laughlin Marianaccio and Owens, Inc. (LM&O), who, in turn, would subcontract with Docupak. Docupak would then enter into a sponsorship contract with a specific race team selected by the ARNG. Docupak contracted with Panther Brands in 2012 for ARNG to sponsor Panther Racing through the 2013 Indycar season, which contract ended with the last race on October 19, 2013.

[7] In conjunction with the ARNG's sponsorship of Panther Racing during the 2013 Indycar season, Panther Brands and Indycar entered into a 2013 Panther Brands Sponsorship Agreement (Sponsorship Agreement), which was effective as of January 1, 2013 and expired on December 31, 2013. Pursuant to the Sponsorship Agreement, the ARNG became a "non-exclusive promotional partner of [Indycar] and the IZOD IndyCar Series" for the 2013 series. (Appellant's App. Vol. II, p. 123). Through the Sponsorship Agreement, Panther Brands secured various promotional opportunities and privileges from Indycar for the ARNG. For instance, the Agreement provided Panther Brands,

among other things, credentials, tickets, video footage, radio advertisements, online marketing, and the placement of ARNG's logo on Indycar-owned equipment. Panther Brands also obtained a "limited, non-transferable and non-exclusive license" to use an area within the Indycar Fan Village (a.k.a. Fan Zone) at each race throughout the 2013 season, subject to various terms and conditions.

[8] Panther and Indycar commenced negotiating the Sponsorship Agreement in February 2013 and executed the Agreement in July 2013. Early in the negotiations, Panther voiced concerns that Indycar wanted to pursue sponsorship arrangements directly with Panther's sponsors, including the ARNG. To alleviate these apprehensions, the parties agreed to insert Section 9.15 into the Sponsorship Agreement, which reads as follows:

> [Indycar] agrees that, other than through Panther Brands, it will not enter into sponsorship agreements during the Term and for a period of one (1) year following the Term with the following Panther Brands clients: [ARNG], Lincoln Tech, Drash, TriWest, Oracal and Emergent. It is understood and agreed that the foregoing limitation extends to agreements for the benefit of the sponsors listed in the preceding sentence with agencies or companies representing such sponsors (other than Panther Brands), including, without limitation [Docupak] and [LM&O].

(Appellants' App., Vol. II Conf., p. 129). In addition, Indycar agreed to provide Panther Brands with a limited, non-transferable, and non-exclusive license to use an area of the Fan Village throughout the 2013 race season, subject to the following limitations:

> 4.6 [Indycar] hereby grants Panther Brands a limited, non-transferable and non-exclusive license to use an area designated for exclusive use by Panther Brands on behalf of the [ARNG] in the Fan Village in the location designated by [Indycar] during practice, qualification and race days at all United States events, subject in each instance, to all limitations on [Indycar's] rights to use the area in which the Fan Village is located as set forth in this Section. It is expressly agreed that this opportunity may not be utilized by Panther Brands on behalf of any Panther Brands' clients other than [ARNG] without the prior written consent of [Indycar].

(Appellants' App., Vol. II Conf., p. 125). Consistent with the parties' negotiations, Indycar agreed that the ARNG would be "the sole U.S. Armed Forces division to be displayed in the Fan Village during the [t]erm" of the Agreement. (Appellants' App. Vol. II Conf., p. 126). Nevertheless, the Sponsorship Agreement reiterated its non-exclusive relationship in Section 4.5:

> Panther Brands, for itself and its designees, hereby acknowledges and agrees that its relationship with [Indycar] is non-exclusive in all respects and that [Indycar] shall have the right to seek and may enter into sponsorship and/or other relationships with third parties including third parties who are competitors of Panther Brands, [ARNG] and/or any other Panther Brands clients receiving promotional opportunities and privileges hereunder.

(Appellants' App., Vol. II Conf., p. 125).

[9] On September 3, 2013, Docupak sent a Request for Proposal (RFP) to six Indycar teams for a potential ARNG sponsorship during the 2014 race season. The RFP requesting proposals and pricing for the 2014 season, renewable for four years, included the requirement of Fan Village space exclusive to ARNG.

A number of race teams—including Panther and RLL—submitted proposals in response to the RFP. On or about October 3, 2013, the ARNG announced that it had decided to sponsor RLL during the 2014 Indycar race season. Panther objected to ARNG awarding its sponsorship to RLL, contending that it had secured the exclusive right to obtain Fan Village access for ARNG for 2014 from Indycar through Section 9.15 of the Sponsorship Agreement and therefore was the only bidder in a position to fulfill the RFP requirements.

[10] Brian Marks (Marks) had prepared RLL's proposal in response to the RFP. After ARNG awarded its sponsorship to RLL, Marks confided to RLL's owner, Bobby Rahal (Rahal), that he had heard "a rumor in the paddock" that Panther was asserting a claim to the 2014 Fan Village access for ARNG. (Appellees' App., Vol. IV, p. 229). Marks and Rahal telephoned Miles, Indycar's CEO, and inquired whether anything prohibited Indycar from providing Fan Village space to RLL for ARNG. Despite Miles' assurance that there was no problem in acquiring Fan Village space, Rahal requested Indycar to put the confirmation in writing. Consequently, on October 14, 2013, Miles sent RLL a signed letter, confirming

> This letter is in response to your inquiry regarding whether there is any prohibition against [Indycar] providing space in the Fan Village during 2014 to [RLL] for use by [RLL's] sponsor, the [ARNG]. I can confirm that there is not; however, to be clear, this includes space in the Fan Village, but not [Indycar] sponsorship rights.

(Appellants' App., Vol. II Conf., p. 173). Miles reiterated the commitment by a second letter sent on November 11, 2013.

[11] On July 31, 2014, RLL purchased a "2014 Fan Village Sponsorship Agreement" from Indycar in the amount of $500,000 to benefit the ARNG. (Appellant's App., Vol. II Conf., p. 180). RLL did not negotiate with Indycar for the Fan Village purchase price, nor did RLL enter into any sponsorship agreement or any other written agreement regarding the space apart from the invoice.

[12] On October 17, 2016, Panther filed its First Amended Complaint, raising six Counts: (1) breach of contract against Indycar; (2) interference with contract against RLL; (3) conversion against RLL, Indycar, and Docupak; (4) statutory damages against RLL, Indycar, and Docupak arising out of the conversion claim; (5) unfair competition conspiracy against RLL, Indycar, and Docupak; and (6) statutory bid-rigging against RLL, Indycar, and Docupak. On April 4, 2017, after all Defendants filed separate motions to dismiss all Counts of the First Amended Complaint, the trial court granted Defendants' motions to dismiss with respect to Count 5 only, refusing to dismiss any other Counts. Subsequently, during July and August 2018, all Defendants filed separate motions for summary judgment on the remaining Counts, together with a memorandum and designation of evidence. Panther responded to each party's motion for summary judgment in turn, together with a memorandum of law and designation of evidence. On September 17, 2018, the trial court heard oral argument on the pending summary judgment motions.

[13] On October 31, 2018, the trial court issued its fifty-seven page Order, granting all motions for summary judgment. Specifically, the trial court concluded that, with respect to the breach of contract and interference of contract claims, Indycar did not breach the contract because Section 9.15 of the Sponsorship Agreement did not prohibit Indycar from selling the 2014 Fan Village space to RLL. Summary judgment was granted in favor of Defendants on the conversion and statutory damages Counts because, based on the trial court's contractual interpretation, "Panther had no right to exclusively provide ARNG with [Fan Village access] … in 2014" so "there is no property interest which could have been converted[.]" (Appellant's App., Vol. II, p. 79). The trial court concluded that there was no material issue of fact that bid-rigging occurred because RLL could represent to ARNG that it could provide Fan Village access. Finding these conclusions dispositive of Panther's claims, the trial court did not address other arguments raised by the Defendants.

[14] Panther now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[15] In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind. Ct. App. 2008), *trans. denied*. Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether

the trial court has correctly applied the law. *Id*. at 607-08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id*. at 608. A fact is 'material' for summary judgment purposes if it helps to prove or disprove an essential element of the plaintiff's cause of action; a factual issue is 'genuine' if the trier of fact is required to resolve an opposing party's different version of the underlying facts. *Ind. Farmers Mut. Ins. Group v. Blaskie*, 727 N.E.2d 13, 15 (Ind. 2000). The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *First Farmers Bank & Trust Co.*, 891 N.E.2d at 607.

[16] This appeal requires the interpretation of a contract. Interpretation and construction of contract provisions are questions of law. *Barker v. Price*, 48 N.E.3d 367, 370 (Ind. Ct. App. 2015). As such, cases involving contract interpretation are particularly appropriate for summary judgment. *Id*. And because the interpretation of a contract presents a question of law, it is reviewed *de novo* by this court. *Id*.

[17] We observe that, in the present case, the trial court entered detailed and lengthy findings of fact and conclusions of law thereon in support of its judgment. Generally, special findings are not required in summary judgment proceedings and are not binding on appeal. *AutoXchange.com. Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40, 48 (Ind. Ct. App. 2004). However, such findings offer a court valuable insight into the trial court's rationale and facilitate appellate review. *Id.*

## II. *The Sponsorship Agreement*

Panther contends that the trial court erred in concluding, as a matter of law, that the unambiguous language of Section 9.15 of the Sponsorship Agreement did not prohibit Indycar from selling the 2014 Fan Village area to RLL for the benefit of the ARNG.

"The goal of contract interpretation is to determine the intent of the parties when they made the agreement." *Celadon Trucking Servs, Inc. v. Wilmoth*, 70 N.E.3d 833, 839 (Ind. Ct. App. 2017). This court must examine the plain language of the contract, read it in context and, whenever possible, construe it so as to render every word, phrase, and term meaningful, unambiguous, and harmonious with the whole. *Id*. Construction of the terms of a written contract generally is a pure question of law. *Id*. If, however, a contract is ambiguous, the parties may introduce extrinsic evidence of its meaning, and the interpretation becomes a question of fact. *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016), *trans. denied*. "A word or phrase is ambiguous if reasonable people could differ as to its meaning." *Id*. A term is not ambiguous solely because the parties disagree about its meaning. *Id*. Courts may properly consider all relevant evidence to resolve an ambiguity. *Celadon Trucking Servs., Inc.*, 70 N.E.3d at 839. An ambiguous contract should be construed against the party who furnished and drafted the agreement. *Id.* If contract language is unambiguous, this court may not look to extrinsic evidence to expand, vary, or explain the instrument but must determine the parties' intent from the four corners of the instrument. *Id*. "Extrinsic evidence is

evidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement." *Id.*

[20] Relying on the language of Section 9.15 of the Sponsorship Agreement, Panther insists that ARNG's access to the Fan Village in 2014 was only available through a sponsorship with Panther and contends that Indycar subverted the intent of the Section. Even though pursuant to the phrasing of Section 9.15, race teams are not specifically listed in the section as an agency or company that can represent ARNG, Panther argues that by accepting the sponsorship, RLL in effect represented ARNG—"[i]f Panther was ARNG's representative in 2013 under the ARNG sponsorship, RLL was ARNG's representative in 2014 under the ARNG sponsorship." (Appellant's Br. p. 19). Characterizing RLL as a "pass through" for the sale of the sponsorship, Panther maintains that Indycar in effect circumvented the limitations of Section 9.15 by using RLL as a "pass through" for the sponsorship fund and in essence contracted with Docupak, as the agent of ARNG, thereby breaching the provisions of the Sponsorship Agreement.

[21] Examination of the Sponsorship Agreement as a whole reflects a "non-exclusive" relationship between Panther and Indycar, granting Indycar the "right to seek and [] enter into sponsorship and/or other relationship with third parties who are competitors of Panther Brands, [ARNG] and/or any other Panther Brands clients receiving promotional opportunities and privileges hereunder." *See* Section 4.5 of the Sponsorship Agreement (Appellants' App.

Vol. II Conf., p. 125). With respect to the Fan Village, the contractual provisions specified in Section 4.6 that Panther held a limited and non-exclusive license to use a defined area of the Fan Village for the exclusive use of the ARNG only. No obligations or restrictions were imposed on Indycar by virtue of this Section and, pursuant to this language, Indycar could grant a similar license to any of Panther's competitors. However, the general and unlimited phrasing of Sections 4.5 and 4.6 are restricted by the boundaries imposed by Section 9.15. As such, Indycar is prohibited from entering "into sponsorship agreements [with ARNG] during the Term and for a period of one (1) year following the Term[.]" *See* Section 9.15 (Appellant's App. Vol. II Conf., p. 129). This "limitation extends to agreements for the benefit of [ARNG] with agencies or companies representing [ARNG]," including Docupak and LM&O. *See* Section 9.15 (Appellant's App. Vol. II Conf., p. 129). Therefore, the issue properly framed before us is whether RLL, as a racecar company and sponsored by ARNG, can be considered to be representing ARNG for purposes of Section 9.15 of the Sponsorship Agreement.

[22] "Representation" is defined as "[t]he act or instance of standing for or acting on behalf of another[,]" while a "sponsor" is explained as "[a] business that pays for a television or radio program, usu[ally] in return for advertising time." Black's Law Dictionary, 1328 (8th ed.); Webster's Dictionary, 1067 (1995 ed.) Applying these definitions to the reality of the racing world, it is apparent that—as already determined by the trial court—RLL is a race team and a target of sponsorships. Businesses approach RLL, by RFP or direct contact, to

advertise their name or logo on RLL's assets. On the other hand, a marketing agency functions as an intermediary, whose job it is to locate partners willing to advertise the business the marketing agency is representing. Therefore, as RLL does not represent ARNG but rather is a recipient of its money in return for advertising, Indycar is not bound by the restrictions of Section 9.15 of the Sponsorship Agreement and is free to enter into a "relationship" with RLL pursuant to Section 4.5.

[23] In an attempt to transform RLL into a marketing agency for purposes of Section 9.15, Panther cites to the trial court's finding that RLL "is an [Indycar] race team which serves as its own marketing services and brand management company." (Appellant's App., Vol. II, p. 51). Panther's argument is unpersuasive. The trial court was simply noting that while Panther had split its race team and marketing efforts into two distinct businesses, RLL included both its race team and marketing under one umbrella. Moreover, just as Panther Brands "provided marketing and brand management services to Panther Racing," RLL's marketing efforts would be concentrated on promoting its race team, not on representing a third-party company.

[24] Accordingly, as there is no genuine issue of material fact that Indycar was allowed to enter into an agreement with RLL for Fan Village space during the 2014 race season, we affirm the trial court's conclusion that, as a matter of law,

Indycar did not breach the provisions of the Sponsorship Agreement with Panther.[3]

### III. *Claim of Bid-Rigging*

[25]  Next, Panther contends that the trial court erred in granting summary judgment to Defendants on its bid-rigging claim. Claiming that Docupak's conduct in essence constituted government procurement through false information, Panther argues that the company made unauthorized changes to its bid by compiling its own summary of Panther's bid and thereby intentionally omitting outside media opportunities Panther could offer ARNG and intentionally adding "$4 million worth of costs for services to be provided [] by Docupak." (Appellant's Br. p. 25). Panther maintains that these intentional amendments to its bid by Docupak aided RLL in securing ARNG's sponsorship.

[26]  The false information or bid-rigging statute in effect[4] at all relevant events, provided, in pertinent part that

---

[3] Panther devotes several pages of its appellate brief to the argument that the trial court's conclusion that Section 9.15 of the Sponsorship Agreement was clear and unambiguous contradicted its prior order which granted in part and denied in part Defendant's motions to dismiss and which declared the phrasing of Section 9.15 to be ambiguous. Panther's argument ignores "a well-settled practice in this state, namely . . . [that] a trial court has inherent power to reconsider, vacate, or modify any previous order so long as the case has not proceeded to final judgment." *Mitchell v. 10th and The Bypass, LLC*, 3 N.E.3d 967, 971 (Ind. 2014) (quoting *Haskell v. Peterson Pontiac GMC Trucks*, 609 N.E.2d 1160, 1163 (Ind. Ct. App. 1993)). As final judgment was not entered until after the trial court granted all pending summary judgment motions, the trial court was free to modify and/or reconsider its prior characterization of Section 9.15.

[4] The statute was repealed by P.L. 158-2013, SEC. 484, eff. July 1, 2014.

> A person who knowingly or intentionally provides false information to a governmental entity to obtain a contract from the governmental entity commits a Class A misdemeanor.

I.C. § 35-43-5-11.

[27] The designated evidence reflects that Docupak submitted its proposal, containing race team alternatives from RLL, Panther, and others to LM&O, in order to enter into a contract with LM&O. Docupak did not provide information directly to ARNG or any governmental entities; nor did it expect to enter into a contract with a governmental actor. Even though Docupak put the information in a form that LM&O amended when it made its own submission to ARNG, Docupak had no control or input in the presentation of LM&O's proposal. Regardless of which race proposal ARNG ultimately settled for, Docupak would be a subcontractor to LM&O and would not enter into a contract directly with ARNG. Accordingly, any specific information about the separate teams that Docupak provided could not have been submitted in order for Docupak "to obtain the contract" with ARNG. *See* I.C. § 35-43-5-11.

[28] Before the trial court, Panther advocated to broaden the interpretation of the bid-rigging statute to include the situation where information is indirectly provided to the governmental entity. However, we note that the repealed Indiana Code section 35-43-5-11 is a criminal statute and "statutes that are criminal or penal in nature must be strictly construed." *Hook v. State*, 775 N.E.2d 1125, 1127 (Ind. Ct App. 2002), *trans. denied*. Accordingly, we cannot expand the statute and rewrite it to cover a situation that the statute does not

expressly provide for. *See Smith v. State*, 867 N.E.2d 1286, 1288-89 (Ind. 2007) (court rejected State's request to insert the word "indirectly" into a criminal statute definition of "child care worker" to include those "indirectly" employed by a school corporation). Therefore, as Docupak did not provide any information[5] to ARNG to obtain a contract for ARNG, we conclude, as a matter of law, that there is no genuine issue of material fact that Docupak did not commit bid-rigging and affirm the trial court's grant of summary judgment in favor or Defendants.

## IV. *The Tort of Unfair Competition*

[29] Lastly, Panther maintains that the trial court erred when it narrowly construed its claim of unfair competition and found in favor of Defendants. Specifically, on appeal, Panther claims that its former contact person with ARNG is now employed by RLL and in the process of his new employment provided RLL with trade secrets this contact person learned during his dealings with Panther. Panther boldly alleges that "[t]he disclosure of trade secrets to a competitor by a company's [point of contact] in exchange for a bribe, to aid that competitor in a bidding process against the company, is a crime." (Appellant's Br. p. 26)

[30] In its summary judgment entry, the trial court found

---

[5] Because we decide the issue on whether Docupak submitted information to ARNG, we refrain from deciding whether the information submitted was false or whether the statute is applicable even when Docupak's conduct occurred in Alabama to procure a contract in Virginia.

Panther's Complaint does not allege the impermissible use of trade secrets by former employees nor does it allege that the Defendants have sought to create confusion among the general public. Panther instead invites the [c]ourt to extend the tort to apply to allegations of RLL/Docupak passing off the access to Fan Village for the ARNG as its own and bribery of an individual in possession of trade secrets regarding the Sponsorship Agreement.

The [c]ourt is hesitant to create another cause of action for unfair competition, especially when the allegations which form the basis of this tort are so attenuated from the claims for relief. To the extent that RLL/Docupak have tried to pass off Panther's right to Fan Village access as its own, that is more akin to conversion of property, which has already been discussed. Regarding the bribery allegation, that is a serious accusation to challenge the hiring of a person to act as a liaison in a sponsorship bidding process when that person has considerable experience in the field. Furthermore, the allegations fail to show the impact, if any, of RLL hiring ARNG's former employee had on the bid process. Panther is asking this [c]ourt to find unfair competition based on several different allegations of impropriety. As neither the General Assembly nor the appellate courts have created a vehicle to bring claims of unfair competitor [sic], the [c]ourt declines to do so here.

(Appellant's App. Vol. II, p. 43).

[31]     A valid common law cause of action exists for the tort of unfair competition. *Bartholomew Co. Beverage Co., Inc. v. Barco Beverage Corp., Inc.*, 524 N.E.2d 353, 358 (Ind. Ct. App. 1988). Although the law of unfair competition has been defined as the palming off of one's goods or services as that of someone else, and the attempt thereof, the tort of unfair competition is much broader and also

includes actions for the interference with a contract or business relationship, as well as for predatory price cutting. *Id.* (citing *Hammons Mobile Homes, Inc. v. Laser Mobile Home Transport, Inc.*, 501 N.E.2d 458, 461 (Ind. Ct. App. 1987)).

> Unfair competition . . . does not describe a single course of conduct or a tort with a specific number of elements; it instead describes a general category into which a number of new torts may be placed when recognized by the courts. The category is open-ended, and nameless forms of unfair competition may be recognized at any time for the protection of commercial values.

*Felsher v. University of Evansville*, 755 N.E.2d 589, 599 (Ind. 2001) (quoting W. Page Keeton, *Prosser and Keeton on the Law of Torts*, 1015 (5th ed. 1984)).

[32] Leaving aside the question as to whether a new cause of action should be recognized under the tort of unfair competition, as advocated by Panther, Panther failed to designate evidence to support its allegation. With only referencing general statements included in its Complaint, Panther omits to establish the exact information its contact person appropriated and improperly divulged to RLL so as to rise to the level of a trade secret. Panther also fails to designate any specifics on how the contact person improperly influenced the bidding process to skew the result and the subsequent award of sponsorship to ARNG. Accordingly, we conclude, as a matter of law, that there is no genuine issue of material fact that RLL committed the tort of unfair competition and affirm the trial court's grant of summary judgment in favor of Defendants.

# CONCLUSION

Based on the foregoing, we hold that, as a matter of law: (1) the contract between Panther Brands and Indycar did not prohibit Indycar from providing RLL access to the Fan Village in 2014 for the benefit of the ARNG; (2) Defendants did not commit bid-rigging; and (3) the trial court properly refused to extend the tort of unfair competition to include claims for the perceived misuse of confidential information.

Affirmed.

Robb, J. and Pyle, J. concur